NATIONAL RURAL UTILITIES
COOPERATIVE FINANCE
CORP., Plaintiff,

v.

The UNITED STATES, Defendant.

No. 249–85C.

United States Claims Court.

Jan. 7, 1988.

Richard C. Tufaro, New York City, for plaintiff. Mark Parry, of counsel.

James G. Bruen, Jr., Washington, D.C., for defendant, with whom were Asst. Atty. Gen. Richard K. Willard, J. Christopher Kohn, Timothy F. Brown, of counsel.

## OPINION

FUTEY, Judge.

This case is before the court on cross-motions for summary judgment. Plaintiff's motion seeks restitution from the United States in the principal amount of $8,000,000 based on an alleged breach of contract by the Department of Agriculture's Rural Electrification Administration. Plaintiff argues that defendant failed to honor a written commitment to grant plaintiff a lien accommodation with respect to plaintiff's $8,000,000 loan to one of its members, the Wabash Valley Power Association, an electric cooperative whose assets were encumbered by a joint mortgage held by plaintiff and defendant. Defendant denies that it had a contract with plaintiff to grant the subject lien accommodation. Defendant's motion seeks dismissal of plaintiff's action for breach of contract, as well as plaintiff's other claims for relief based on the alternative theories of fraudulent inducement, unilateral mistake, mutual mistake, and unjust enrichment. For the reasons discussed hereinafter, plaintiff's motion for summary judgment is denied, and defendant's motion for summary judgment is granted.

## FACTS

Plaintiff, National Rural Utilities Cooperative Finance Corporation (CFC), is a not-for-profit cooperative association incorporated in the District of Columbia. It was formed in 1969 by rural electric systems and their service organizations to serve as a self-help supplemental financing institution. To raise funds, CFC sells bonds and commercial paper in the public market, capital term certificates (CTCs) to its members, and obtains bank loans.

Defendant, acting through the Rural Electrification Administration (REA) of the Department of Agriculture, makes loans and guarantees to facilitate rural electrification pursuant to the Rural Electrification Act of 1936, as amended, 7 U.S.C. §§ 901 et seq. Under the REA loan program for bulk power plants, funds are advanced by the Federal Financing Bank (FFB) of the Department of the Treasury and repayment is guaranteed by REA. The loans are secured by mortgages on the borrowers' assets. As guarantor, REA administers the loans and mortgages on FFB's behalf, receiving all payments and exercising all rights under the loans and mortgages.

Wabash Valley Power Association, Inc. (Wabash) is a not-for-profit cooperative, and member of CFC, located in the State of Indiana. In 1978 Wabash, by means of a loan (the FFB Loan) under REA's guaranteed loan program, joined with Public Service Company of Indiana in the financing

and ownership (Wabash's interest was 17%) of the Marble Hill Nuclear Generating Station. By January 1984, Wabash had borrowed approximately $466.7 million under the FFB Loan in furtherance of the Marble Hill project, against which REA was granted a first lien on all of Wabash's existing and after-acquired assets. REA's agreements with Wabash and FFB provided that repayment of principal was to be deferred for seven years, during which time interest coming due was added to the principal of the loan.

In January 1984, however, the Public Service Company of Indiana informed Wabash that it was financially unable to complete construction of the Marble Hill plant. Construction was suspended at that time and has not been resumed. REA thereupon advised Wabash that it could not continue to capitalize interest in the foregoing manner, and demanded that Wabash begin making quarterly interest payments on the FFB Loan.

Wabash could not meet this debt service obligation (totalling some $50 million annually) out of existing resources. To remedy this revenue shortfall, Wabash estimated that it would have to increase its rates for electricity sales by about 50%. A rate increase required the approval of the Indiana Public Service Commission (Indiana PSC), however, which could not be obtained immediately.

Meanwhile, the March 31, 1984, quarterly interest payment was coming due. Wabash asked REA to approve the advance of additional funds under the FFB Loan to meet this obligation. REA approved this request in the amount of $12,107,000, conditioned upon Wabash's commitment to file a petition with Indiana PSC for a rate increase sufficient to cover all of the company's financial requirements for the succeeding 15 months. REA also advised Wabash, pending such a rate increase, to investigate other financial resources to meet future debt service payments.

On April 6, 1984, Wabash duly petitioned Indiana PSC for a 51.15% rate increase. Wabash also retained Lehman Brothers Kuhn Loeb, Inc., to scout out the possibilities of obtaining unsecured financing. Five banking institutions contacted thereby declined to extend an unsecured loan to Wabash.

Wabash then turned to CFC, which in the early 1980's had twice guaranteed bond issues to finance construction of other Wabash property. In each such instance REA had granted a lien accommodation in favor of CFC, thereby securing the guarantees by making CFC a co-mortgagee of Wabash's assets. In discussions lasting through the spring of 1984, CFC agreed in principle to make a long-term loan to Wabash, in the form of quarterly advances, so that Wabash could meet its upcoming debt service obligations. By letter dated June 4, 1984, CFC advised REA that it was prepared to make a long-term loan to Wabash if REA, as in the previous manner, would provide security by accommodating its mortgage lien. Shortly thereafter CFC furnished REA with draft CFC/Wabash loan documents providing for a commitment by CFC totalling $53 million.

Representatives of Wabash, CFC, and REA met on June 19, 1984, to discuss CFC's proposed loan to Wabash as well as the conditions for a lien accommodation by REA. These conditions were set forth in a letter from REA's Administrator, Harold Hunter, to the President of Wabash, Elmer Stocker, on June 27, 1984 (a copy was also sent to CFC), which reads as follows:

Mr. Elmer L. Stocker, President
Wabash Valley Power Association, Inc.
P.O. Box 24700
Indianapolis, Indiana 46224
Dear Mr. Stocker:

The Rural Electrification Administration (REA) has considered the request of Wabash Valley Power Association (WVPA), that REA accommodate its lien on WVPA's assets to facilitate WVPA borrowing funds from the National Rural Utilities Cooperative Financing Corporation (CFC).

We are pleased to inform you that REA will grant an accommodation of the Government's mortgage lien to allow the securing of notes payable to CFC under the terms of a Supplemental Mortgage

and Security Agreement (Power Supply—Limited II A). This approval will enable WVPA to obtain financing from CFC in the amount of $53,000,000 to make its debt service payments to the Federal Financing Bank (FFB) through March 31, 1985, relating to the Marble Hill Project, and to make required debt service payments to CFC.

REA approval of this lien accommodation is conditioned upon the acceptance by WVPA of the following provisions as an amendment to its loan contract with REA:

I. Except to the extent REA determines them to be inapplicable all provisions of WVPA's loan contract with REA shall be applicable to this financing.

II. Without limiting the foregoing, WVPA hereby covenants that it will:

—continue to use its best efforts to have into effect by April 1, 1985, rates necessary to meet all of its financial requirements.

—pursue obtaining resolutions from each of its member systems that supports this financing arrangement.

—obtain written REA approval of all advances from the CFC loan.

—obtain all necessary regulatory body approvals of the lien accommodation and the CFC loan.

Continued satisfaction of the above covenants will be evaluated by REA prior to each future advance.

This approval is given with the understanding that the terms and conditions of the CFC loan must be satisfactory to REA.

WVPA may put into effect an intermediate rate increase prior to April 1, 1985.

We discussed that restructuring of the FFB debt might be a condition of the REA lien accommodation. Because many factors involved with the Marble Hill Project are not finalized, we have decided not to pursue the proposed condition at this time.

Copies of this letter are being sent to your manager, Mr. Edward P. Martin, and to CFC.

Please indicate your acceptance of this letter, as an amendment to WVPA's Loan Contract with REA, by signing the acknowledgement and returning the second copy of this letter to REA, together with a certified board resolution evidencing your authority to execute this amendment. This acceptance must be received for REA to approve the first advance from the CFC loan.

Sincerely,
Harold V. Hunter
Administrator

Acknowledgement and Acceptance Wabash Valley Power Association
By:
Title:
Date:

After receiving the requisite authorization from Wabash's board of directors, Mr. Stocker accepted REA's letter in the manner requested on June 29, 1984.

Even as Wabash was accepting the terms of REA's lien accommodation for the CFC loan, it was clear that not "all necessary regulatory body approvals" referenced by REA in its June 27th letter could be obtained by Wabash before its second quarter debt service obligation came due. (As June 30th fell on a Saturday, the payment date was July 2, 1984.) First and foremost, Wabash needed the approval of the Indiana Public Service Commission for the additional long-term loan from CFC, which required a formal petition. While Wabash's cash reserves could cover approximately one-third of the quarterly debt service, the company faced a shortfall of some $8 million. As a stopgap measure, therefore, CFC agreed to advance the necessary funds on an unsecured basis.

The CFC/Wabash loan agreement was finalized on July 2, 1984, and submitted to REA for its approval, as required in the June 27th "lien accommodation letter." The salient section of this agreement provided as follows:

## ARTICLE II

SECTION 2.1. CFC agrees to make, and the Borrower agrees to request, on

the terms and conditions of this Agreement, Advances (herein called "Advances") from time to time ... in an aggregate principal amount not to exceed, prior to September 30, 1984, an initial commitment of $9,610,371.00 ("Initial Commitment") and, thereafter, a total commitment of $53,000,000.00 ("Total Commitment"). Subject to the terms and conditions of this Loan Agreement, CFC agrees to make Advances with respect to the Initial Commitment until June 30, 1985 and with respect to the Total Commitment until a date four years from the date hereof.... The obligation of the Borrower to repay the Advances will be evidenced by a promissory note or notes (with respect to the Initial Commitment (the "Short–Term Note") and the Total Commitment (the "Long–Term Note").

With respect to the Short–Term Note ... the aggregate unpaid principal amount of the Advances thereon, together with accrued interest, shall be payable on June 30, 1985 unless, prior to September 30, 1984, the Borrower shall have obtained the approval and consent of the Indiana Public Service Commission described in Section 3(E) of this Agreement.

If the Borrower obtains the approval of the Indiana Public Service Commission described above, then (i) Advances outstanding on the Short–Term Note shall be converted to Advances on the Long–Term Note....[1]

CFC's Initial Commitment of $9,610,371 consisted of $8,000,000 earmarked for Wabash's quarterly debt service payment, $602,151 for the requisite purchase by Wabash of CTCs (capital term certificates) from CFC, and $1,008,220 for interest on the $8 million through June 30, 1985. The unsecured Short–Term Note evidencing Wabash's repayment obligation to CFC was attached to the loan agreement, as was the unexecuted Long–Term Note with respect to the Total Commitment—the prospective 15–year $53 million secured loan.

Later in the day on July 2, 1984, REA's Administrator, Harold Hunter, sent the following letter to CFC's Governor, Charles Gill:

Mr. Charles B. Gill, Governor
National Rural Utilities
Cooperative Finance Corporation
1115–30th Street, N.W.
Washington, D.C. 20007
Dear Mr. Gill:

On June 27, 1984, REA notified Wabash Valley Power Association, Inc. (WVPA), that REA would grant a lien accommodation to enable WVPA to borrow funds from CFC based upon certain conditions being satisfied.

One of these conditions was that the terms and conditions of the CFC loan were satisfactory to REA. We have now reviewed the WVPA–CFC Loan Agreement (the Agreement) and have determined that the Agreement is acceptable for the purposes established in our June 27th letter to WVPA.

It should be noted that all conditions prerequisite to the lien accommodation have not been satisfied to date.

---

1. Other pertinent provisions of the agreement include the following:

ARTICLE III
SECTION 3. The obligation of CFC to make any Advance hereunder is subject to the following conditions:
E. The Borrower shall have furnished to CFC true and correct copies of all certificates, authorizations and consents, including without limitation the consents referred to in Section 1.H. hereof, necessary for the execution, delivery or performance by the Borrower of this Agreement, the Note and the Mortgage.
ARTICLE I
SECTION 1. The Borrower represents and warrants that:

H. No license, consent or approval of any governmental authority is required to enable the Borrower to enter into this Agreement or to perform any of its obligations provided for herein except that of the REA, and except as disclosed on Schedule 1 hereto.
SCHEDULE 1
4. The governmental authority referred to in Section 1.H. ... is Indiana Public Service Commission.
5. The term Mortgage as used in this Agreement shall mean: the Supplemental Mortgage and Security Agreement, dated as of April 14, 1980, among the Borrower, CFC and REA, as it may have been supplemented, amended, restated, or consolidated to the date of this Agreement.

Sincerely,
Harold V. Hunter
Administrator

Also on July 2, 1984, REA's Director of Northeast Area—Electric, Martin Seipel, addressed a letter to CFC's Loan Officer, Richard Bulman, approving the advance of $8,602,151 by CFC to Wabash to cover the latter's second quarter debt service on the FFB Loan and purchase of CTCs.

These two letters from REA were delivered to CFC either late July 2 or early July 3. On the morning of July 3, 1984, CFC wired $8 million to FFB in partial payment, a day late, of Wabash's second quarter debt service. The other $602,151 financed Wabash's purchase of the CTCs.

On July 6, 1984, Wabash petitioned Indiana PSC for approval of a $53 million long-term loan from CFC and the authority to execute a supplemental mortgage to secure the loan. On September 17, 1984, REA sent another letter to Wabash (with a copy to CFC) confirming that a lien accommodation would be granted provided the terms and conditions outlined in the "lien accommodation letter" of June 27th were satisfied.

By order dated September 28, 1984, however, Indiana PSC authorized Wabash to borrow only $12.5 million from CFC for the purpose of meeting its third quarter debt service (due October 1st since September 30th fell on a Sunday). A hearing was scheduled for November 7, 1984, on the balance of the $53 million request. CFC declined to advance another $12.5 million on an unsecured basis, however, and Wabash defaulted on its debt service obligation to FFB. As guarantor of the FFB Loan, REA made the October 1, 1984 interest payment and has made each quarterly payment since then.

At CFC's request, Wabash applied to Indiana PSC on November 2, 1984, for approval to convert the unsecured short-term advance of July 1984 into a long-term secured loan. Wabash indicated that it was no longer seeking to borrow funds from CFC for its October 1, 1984 or subsequent debt service payments, but requested that Indiana PSC authorize Wabash to execute a new long-term note and supplemental mortgage securing the $8,602,151 loan extended in July. By order dated January 16, 1985, Indiana PSC granted the petition, authorizing Wabash "to convert its short-term note dated July 2, 1984, in the principal amount of $9,610,371, to a long-term note in the principal amount of $8,602,151, and to execute a Supplemental Mortgage and Security Agreement to secure the payment of said note." (The order also withdrew the previous authorization to Wabash to borrow an additional $12.5 million from CFC.)

Upon the issuance of the foregoing order by Indiana PSC, CFC requested REA to sign the supplemental mortgage granting a lien accommodation to secure the $8,602,151 loan. REA refused to do so, however, on the grounds that a lien accommodation was predicated on Wabash obtaining approval for a loan from CFC in the full amount of $53 million.

By letter dated March 13, 1985, REA's Administrator, Mr. Hunter, advised CFC's Governor, Mr. Gill, that a lien accommodation could be provided if the Government "receives a benefit of sufficient value to compensate for the resulting dilution of security." Mr. Hunter suggested that REA would sign a supplemental mortgage granting a lien accommodation on the $8,602,151 loan if CFC would advance another $1.7 million to be applied by Wabash against the amount currently in default to REA. This $1.7 million loan would also be secured under the lien accommodation, regardless of whether it was advanced initially under a short-term or long-term note. In a return letter to Mr. Hunter dated March 26, 1985, however, Mr. Gill termed REA's conditions unacceptable.

On May 23, 1985, Wabash filed for reorganization under Chapter 11 of the Bankruptcy Code. The bankruptcy proceeding is still ongoing.

CFC filed its complaint in this court on April 29, 1985, seeking restitution of the $8 million payment to FFB "made on Wabash's behalf and to the benefit of REA" in July 1984. The $602,151 loaned to finance

Wabash's purchase of CTCs from CFC was not part of the complaint. Cross motions for summary judgment were filed on February 11–12, 1987, and oral argument was heard on September 10, 1987.

## DISCUSSION

### I. *Breach of Contract Action.*

Summary judgment is appropriate where there are no disputed issues of material fact and the only issue for the court is the construction of an unambiguous writing. *Brame v. United States*, 10 Cl.Ct. 252, 254 (1986); *South Louisiana Grain Services, Inc. v. United States*, 1 Cl.Ct. 281, 289 (1982). Where there is a question on a motion for summary judgment of construction of a written contract, and it can be determined by consideration of the plain and unambiguous wording of the contract, the question is one of law to be resolved by the court. *Ceccanti, Inc. v. United States*, 6 Cl.Ct. 526, 528 (1984) ("It is well settled that the interpretation of a contract is a question of law."); *D & S Universal Mining Co. v. United States*, 4 Cl.Ct. 94, 96 (1983).

The parties to this action have stipulated that the only binding commitment, if any, of REA to provide a lien accommodation for the proposed loan from CFC to Wabash, to enable the latter to meet its debt service obligation to FFB, is contained in the June 27, 1984 letter from REA's Administrator, Mr. Hunter, to Wabash's President, Mr. Stocker.[2] Both plaintiff and defendant assert that this letter is unambiguous, that the court need look no further than the face of the document to interpret its contents.[3] "When parties have deliberately put their engagements in writing, and such writing is complete on its face and is certain and definite as to the objects of their engagement, it is conclusively presumed that the whole contract of the parties and the extent and manner of their undertaking was reduced to writing, and

cannot be contradicted, altered, added to or varied by parol or extrinsic evidence." 4 *Williston on Contracts*, § 632A, at 985 (3d ed. 1961). The court agrees that the subject "lien accommodation letter" may be interpreted without resort to parol evidence. As such, this action is ripe for disposition by summary judgment.

Plaintiff alleges that the letter of June 27, 1984, created a binding commitment on the part of REA to grant a lien accommodation in favor of CFC on two conditions. According to CFC's interpretation, these conditions were (1) Wabash's *acceptance*, (emphasis added), as an amendment to its REA loan contract, of five provisions set forth on page one of the letter, to the effect that:

— all provisions of the REA Loan Agreement shall be applicable to the CFC financing;

— Wabash will use its best efforts to have in effect a rate increase by April 1, 1985;

— Wabash will pursue obtaining from its member systems resolutions supporting the CFC financing;

— Wabash will obtain written approval of all advances from the CFC loan;

— Wabash will obtain all necessary regulatory body approval of the lien accommodation and the CFC loan;

and (2) REA's satisfaction with the terms and conditions of the CFC loan (as provided at the top of page two of the letter).

Plaintiff argues that these two conditions were satisfied when (1) Wabash signed the "Acknowledgement and Acceptance" of the lien accommodation letter and returned a copy thereof, together with the requisite certified board resolution, to REA on June 29, 1984, and (2) REA advised CFC, by letter dated July 2, 1984, that the terms and conditions of the CFC/Wabash loan agreement were satisfactory. Consequently, upon the Indiana PSC's approval on January 16, 1985, of Wabash's petition

---

**2.** *Stipulation of Facts and Contentions,* filed October 29, 1986.

**3.** *United States' Motion for Summary Judgment,* p. 15.

*Plaintiff's Memorandum in Support of Motion for Summary Judgment,* pp. 17–19.

to convert the July 1984 advance into a long-term secured loan, REA was bound to sign the supplemental mortgage granting CFC a lien accommodation. REA's refusal to do so, according to plaintiff, constituted a breach of contract with CFC.

Defendant contends that REA's letter of June 27, 1984, did not create any contractual relationship with CFC, since the letter was addressed to Wabash and limited acceptance of REA's offer of a lien accommodation to Wabash. Moreover, even assuming that the letter did establish a contractual relationship between REA and CFC, REA's performance never came due because two principal conditions to the lien accommodation, as set forth in the letter, were not met. These unmet conditions, according to the defendant, were (1) the failure of Wabash to obtain authorization from Indiana PSC to borrow $53 million from CFC and (2) the failure of CFC and Wabash to comply with the terms of their loan agreement as approved by REA—specifically, obtaining authorization within the requisite time period to execute the long-term $53 million note.

### a. *Was There a Contract Between CFC and REA?*

■ After thorough review of the lien accommodation letter, in the context of attending circumstances, the court finds that it formed the basis of a binding contract between REA and CFC. Although defendant argues that its offer of a lien accommodation was made exclusively to Wabash, it is clear that the grant of a lien accommodation was predicated on undertakings of CFC as well as Wabash, and would confer benefits on CFC as well as Wabash. These respective undertakings and benefits are squarely set forth in the REA letter. While REA addressed its letter to Wabash and invited the latter's written acceptance of its terms and conditions, a copy of the letter was also sent to CFC. Regardless of the fact that CFC was not the addressee, it was just as surely apprised of the terms and conditions for a lien accommodation as Wabash, and was just as surely invited to take steps in laying the groundwork therefor.

There is ample case law holding that a contractual relationship arises between the government and a private party if promissory words of the former induce significant action by the latter in reliance thereon. *Himfar v. United States*, 355 F.2d 606, 174 Ct.Cl. 209, 214–15 (1966); *Padbloc Co., Inc. v. United States*, 161 Ct.Cl. 369, 378–79 (1963); *Radium Mines, Inc. v. United States*, 153 F.Supp. 403, 139 Ct.Cl. 144, 147–48 (1957). REA's letter of June 27, 1984, contained not only the promise to accommodate the government's lien to facilitate a CFC loan to Wabash, subject to the stated conditions, but also the promise to grant such accommodation *in favor of CFC*. CFC was entitled to rely on this promise in deciding on its course of action with respect to the proposed loan to Wabash.

In effect, REA's letter constituted a unilateral offer of a contract to CFC, inviting acceptance by CFC not in the form of a return promise, but rather in the performance of the act(s) called for therein. See *Williston on Contracts* § 65 (3d ed. 1957). CFC accepted the offer by signing the loan agreement with Wabash and advancing $8,602,151 under the terms of the Initial Commitment. Eight million dollars of this amount was wired directly to FFB in partial payment of Wabash's July 1984 debt service obligation, thereby forestalling Wabash's default and relieving REA of its duty, as guarantor of the FFB Loan, to make the payment itself. Insofar as REA derived a monetary benefit from CFC's payment, such sum represents consideration from CFC to REA.

Thus, the essential elements of a contractual relationship—offer, acceptance, and consideration—were satisfied as between CFC and REA. Once CFC had wired $8 million to FFB on behalf of Wabash, REA's obligation to grant a lien accommodation for this and any future sums advanced under the CFC/Wabash loan agreement depended solely on whether the conditions set forth in the lien accommodation letter were satisfied. If they were, REA could hardly assert that it had no obligation to grant a lien accommodation in favor of CFC. It

would be contractually bound to do so. We must therefore proceed to a detailed analysis of the terms and conditions in the lien accommodation letter to determine whether REA's duty of performance arose.

### b. *Were the Conditions Precedent to a Lien Accommodation Satisfied?*

■ In the second paragraph of the letter, REA stated that it would grant a lien accommodation to "enable WVPA (Wabash) to obtain financing from CFC in the amount of $53,000,000 to make its debt service payments to the Federal Financing Bank (FFB) through March 31, 1985...." Approval of the lien accommodation was conditioned, *inter alia,* on Wabash's acceptance of four covenants, the fourth of which provided that Wabash *"will obtain* all necessary regulatory body approvals of the lien accommodation and the *CFC loan."* (Emphasis added.) The only loan discussed in REA's letter was "in the amount of $53,000,000" (above), and it was in this amount that Wabash sought authorization from Indiana PSC in its petition of July 6, 1984. Indiana PSC declined to authorize a long-term loan of $53 million in its order of September 28, 1984, however, and thereafter Wabash withdrew its request for approval of a loan in that amount. Thus, Wabash failed to obtain the regulatory body approval necessary for the CFC loan on which REA's lien accommodation was predicated.

Plaintiff argues that the fourth covenant did not require Wabash to actually obtain authorization for the $53 million loan, but merely to accept the obligation to try and make a bona fide effort to obtain it. Plaintiff cites the language on page one of the REA letter requiring *"acceptance* by WVPA (Wabash) of the following provisions" (emphasis added), as well as the closing sentences on page one: "Continued satisfaction of the above covenants will be evaluated by REA prior to each future advance;" and page two: "This acceptance must be received for REA to approve the first advance from the CFC loan;" as inconsistent with the view that *compliance* with the covenants was a condition precedent to the granting of a lien accommoda-

tion. Rather, their acceptance by Wabash, in the form of signing the acknowledgement and returning it along with the certified board resolution to REA on June 29, 1984, was all that the lien accommodation letter required.

With REA's letter to CFC on July 2, 1984, advising that the terms and conditions of the CFC/Wabash loan agreement were satisfactory, plaintiff asserts that all the conditions were satisfied for a lien accommodation on subsequent advances. Wabash's petition to Indiana PSC on July 6, 1984, for approval of a long-term $53 million loan from CFC was evidence of its continuing acceptance of covenant number four. Moreover, plaintiff argues that the subsequent failure of Wabash to obtain the $53 million authorization and its withdrawal of the loan request do not alter the fact that as of July 3, 1984, when CFC advanced $8,602,151 as "the first advance on the CFC loan," all of the covenants had been properly accepted by Wabash and all of the conditions for a lien accommodation set forth in REA's letter of June 27th had been fully met.

In the court's judgment, however, plaintiff's interpretation of Wabash's obligations with respect to the covenants does not comport with the language of the lien accommodation letter. While the first two covenants require Wabash to (1) "continue to use its best efforts" to implement rate increases and (2) "pursue obtaining resolutions" of support from other members, the last two covenants require Wabash to (3) "obtain" REA approval of advances from CFC and (4) "obtain" requisite approval of the lien accommodation and the CFC loan. While Wabash's acceptance and bona fide pursuit, without satisfactory completion, of the first two covenants may arguably have been sufficient, the last two covenants lend themselves to no such interpretation. The language of the fourth covenant is obligatory: Wabash "covenants that it *will obtain* all necessary regulatory body approvals...." (Emphasis added.) This language cannot be construed as requiring anything less than full performance of the covenant by Wabash.

As previously discussed, the only loan discussed by REA in its lien accommodation letter was "in the amount of $53,000,-000." Wabash's petition to Indiana PSC for approval of a long-term loan in that amount failed on September 28, 1984, and thereafter Wabash ceased all efforts to obtain approval for the loan. Accordingly, Wabash failed to perform the fourth covenant and REA's obligation to grant a lien accommodation in favor of CFC did not come due.

Another condition which REA set forth in its June 27th letter for the granting of a lien accommodation was that "the terms and conditions of the CFC loan must be satisfactory to REA." On July 2, 1984, REA's Administrator sent a letter to the Governor of CFC declaring that "the Agreement is acceptable for the purposes established in our June 27th letter to WVPA (Wabash)." The terms and conditions of the CFC/Wabash loan agreement were thereby incorporated into REA's agreements with Wabash and CFC, and compliance with these terms and conditions became a condition to REA's duty of performance. See 6 *Williston on Contracts* at § 887 (1962).

The parties to this action have stipulated as follows with respect to the terms and conditions of the CFC loan:

—Under the July 2, 1984 loan agreement, CFC agreed to make, subject to certain conditions, advances to Wabash in an aggregate principal amount not to exceed, prior to September 30, 1984, an Initial Commitment of $9,610,310 (sic), and, thereafter, a Total Commitment of $53,000,000.

—The July 2, 1984 loan agreement contemplated that the obligation of Wabash to repay the advances with respect to the Initial Commitment would be evidenced initially by a Short–Term Note in the form attached to the loan agreement.

—The July 2, 1984 loan agreement further contemplated that the aggregate unpaid principal amount of the advance under the Short–Term Note would be payable on June 30, 1985, unless, prior to September 30, 1984, Wabash obtained approval of the Indiana Public Service Commission to execute the Long–Term Note attached to the July 2 loan agreement and a Supplemental Mortgage. If Wabash obtained such approval from the Indiana Public Service Commission, then the loan agreement contemplated that the advance outstanding under the Short–Term Note would be converted to an advance under the Long–Term Note.

—The advance by CFC to Wabash in the amount of $8,602,151 on July 3, 1984 was with respect to the Initial Commitment. The obligation of Wabash to repay this advance was evidenced by a Short–Term Note identical to the unexecuted Short–Term Note attached to the July 2, 1984 loan agreement.

—By its order dated January 16, 1985, the Public Service Commission of Indiana authorized Wabash to convert the Short–Term Note to a Long–Term Note in the principal amount of $8,602,151 and to execute a Supplemental Mortgage and Security Agreement to secure that Long–Term Note.[4]

The unequivocal language of the CFC/Wabash loan agreement, as stipulated above, set two conditions for the securing of CFC's advance to Wabash under the Short–Term Note in July 1984: (1) that Indiana PSC authorize Wabash "to execute the Long–Term Note attached to the July 2 loan agreement and a Supplemental Mortgage" and (2) that Wabash obtain such authorization "prior to September 30, 1984." The Long–Term Note attached to the loan agreement was in the amount of $53 million, and Indiana PSC did not approve Wabash's execution of this note either before September 30, 1984, or at any time thereafter. Thus, the terms of the loan agreement approved by REA on July 2, 1984, setting forth the conditions for securing CFC's $8.6 million advance, were not met.

Plaintiff argues that the September 30, 1984, deadline was inserted into the loan agreement solely for the purpose of speeding a decision by Indiana PSC on Wabash's

---

4. *Stipulation of Facts and Contentions,* filed October 29, 1986.

petition, and is of no consequence to REA. Moreover, plaintiff argues that Indiana PSC's subsequent approval on January 16, 1985, of Wabash's petition to convert the Short–Term Note into a Long–Term Note in the principal amount of $8,602,151, and to execute a supplemental mortgage securing the note, constituted satisfaction of the conditions for REA to grant a lien accommodation.

The CFC/Wabash loan agreement of July 2, 1984, however, did not provide for the conversion of the Short–Term Note (evidencing the Initial Commitment of $9,610,-371) into a Long–Term Note in that or some lesser amount. Rather, it specifically provided that *"Advances outstanding* on the Short–Term Note shall be converted to *Advances on the Long–Term Note"* (emphasis added) upon the approval of Indiana PSC. The only long-term note referenced in the July 2 loan agreement was the unexecuted $53 million note attached thereto. REA did not approve any modification of the CFC/Wabash loan agreement altering the conditions for securing CFC advances. Consequently, Wabash's petition and Indiana PSC's approval of Wabash's conversion of the short-term unsecured note into a long-term secured note was not in accord with the terms and conditions of the CFC loan approved by REA in July 1984. Thus, without even returning to the issue of the September 30, 1984 deadline, it is clear that REA's obligation to grant a lien accommodation never came due.

The court concludes, therefore, that the conditions set forth in REA's letter of June 27, 1984, for the granting of a lien accommodation in favor of CFC were not satisfied. The unambiguous terms of that letter, together with the CFC/Wabash loan agreement referenced therein and approved by REA, provided that the $53 million Long–Term Note attached to the loan agreement be approved by Indiana PSC prior to September 30, 1984, and executed by Wabash before REA was obligated to execute a supplemental mortgage granting a lien accommodation. Unsecured advances under the Short–Term Note could become secured only by rolling them over into advances under the Long–Term Note,

provided approval for the Long–Term Note was obtained. The lien accommodation letter (and, by reference, the CFC loan) made no provision for the securing of advances under the Short–Term Note by converting *that note* into a long-term note. Accordingly, REA's refusal to execute a supplemental mortgage granting a lien accommodation on CFC's $8.6 million advance represented no breach of contract. Under the well established principle of contract law enunciated in *Peoples Bank & Trust Co. v. United States,* 11 Cl.Ct. 554 at 567 (1987) and *Korea Development Corp. v. United States,* 9 Cl.Ct. 167 at 175–76 (1985), failure of the condition(s) precedent released REA from any contractual obligation to grant CFC a lien accommodation.

Plaintiff's motion for summary judgment based on breach of contract must therefore be denied. Defendant's cross motion for summary judgment on the breach of contract action will be granted.

## II. *Plaintiff's Other Causes of Action*

Plaintiff's alternative claims for relief, based on allegations of unilateral mistake, unjust enrichment, mutual mistake, or fraudulent inducement, seek rescission of the subject contract with defendant and restitution in the principal amount of $8 million. Defendant has moved for summary judgment on these claims, which plaintiff opposes on the grounds that each raises triable issues of fact. The court agrees with defendant that these claims do not present any genuine issues of material fact precluding an entry of summary judgment.

Plaintiff alleges that it was mistaken in believing that the conditions for a lien accommodation were Wabash's acceptance, rather than satisfaction, of the covenants set forth in the REA letter of June 27, 1984, and that the lien accommodation letter covered the July 1984 advance. CFC's mistake materially affected the agreed exchange of performance, according to plaintiff, and permitting REA to benefit therefrom is unjust and unconscionable. On these grounds plaintiff seeks rescission of its contract with REA based on unilateral mistake and unjust enrichment.

A mistake is a belief that is not in accord with the facts. *Restatement (Second) of Contracts* § 151 (1981). The elements of a claim for unilateral mistake are:

(1) mistake by one party, not bearing the risk of such mistake, as to a basic assumption on which he made the contract;

(2) that has a material effect on the agreed exchange of performance; and

(a) the effect of the mistake is such that enforcement of the contract would be unconscionable; or

(b) the other party to the contract has reason to know of the mistake.

*Restatement (Second) of Contracts* § 153 (1981); *Bowen-McLaughlin-York Co. v. United States*, 10 Cl.Ct. 223, 224 (1986).

There is no evidence to support CFC's assertion that it made a mistake of fact with regard to any basic assumption underlying the contract. If CFC's basic assumption was that the covenants need only be accepted rather than fulfilled by Wabash, so that CFC was entitled to a lien accommodation for any sums advanced to Wabash regardless of Indiana PSC's approval of the $53 million package, then CFC made a mistake of contract interpretation by misreading the lien accommodation letter. This would constitute a mistake of law, however, not a mistake of fact. Such mistake of law does not afford plaintiff any grounds for relief based on theories of unilateral mistake and unjust enrichment.

The elements of a claim based on mutual mistake essentially parallel those for unilateral mistake. As stated in *Restatement (Second) of Contracts* § 152, "Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of mistake under the rule stated in § 154." Plaintiff asserts that both CFC and REA were mistaken regarding "Wabash's intent to seek regulatory body approval for a loan of $53,000,000," [5] since Wabash withdrew its request in that amount in the fall of 1984, and also regarding the applicability of the lien accommodation letter to the July 1984 advance.[6] The court finds no merit to either argument.

Wabash did petition Indiana PSC for approval of a $53 million loan on July 6, 1984, right after CFC's advance of $8,602,151 under the CFC/Wabash loan agreement. This action was fully in accord with the basic assumption of CFC and REA that Wabash intended to borrow $53 million. The petition was withdrawn only after Wabash's failure to obtain the above approval by September 30, 1984, as required under the terms of the loan agreement. Wabash's actions after September 30, 1984, are of no consequence to CFC's contract with REA since (1) they do not evidence any mutual mistake as to a basic assumption *at the time the contract was made,* and (2) they occurred after REA's performance was excused for failure of the conditions precedent.

Moreover, there was no mutual mistake as to the applicability of the lien accommodation letter to the July 1984 advance because the letter indisputably *did* apply to that advance. It set forth REA's conditions for the granting of a lien accommodation on that and all future advances by CFC on a loan in the approved amount of $53 million. Only Wabash's failure in September 1984 to obtain the loan approval in that amount excused REA's contractual obligation to CFC to grant a lien accommodation on the previous July's advance.

As for plaintiff's claim of fraudulent inducement, CFC alleges that REA "knowingly, deliberately and intentionally misrepresented material facts, and failed to disclose material facts, with the intent to deceive CFC and for the purpose of inducing CFC to rely thereon in entering the Contract," and that "CFC relied upon these fraudulent misrepresentations of material facts in determining to enter the Con-

5. *Complaint*, p. 14

6. *Plaintiff's Memorandum in Opposition to Motion by United States for Summary Judgment*, pp. 19–20.

tract."[7] Specifically, plaintiff asserts that REA's Deputy Assistant Administrator, Donald Olsen, in conversations with CFC officials in June and July 1984, misrepresented REA's intentions by neglecting to indicate that REA interpreted the lien accommodation letter as not applying to the July 1984 advance unless Wabash obtained regulatory approval for a loan in the full amount of $53 million. The court finds this claim of fraudulent inducement equally without merit.

A claim is voidable due to misrepresentation only if a party makes false statements of fact or fails to disclose facts when he knows that disclosure would correct a mistake of the other party, and the recipient is justified in relying upon the statements or non-disclosures. *Restatement (Second) of Contracts* § 160–164. Neither the Olsen deposition cited by plaintiff nor any other documentation of record evidences any false statements of fact by REA, or failure to disclose facts, which induced CFC in justifiable reliance thereon to enter into a contract with REA. The record reveals no representations by REA to CFC regarding the terms and conditions for a lien accommodation which were inconsistent with the language in REA's letter of June 27, 1984.

Accordingly, the court concludes that plaintiff's claims of unilateral mistake, unjust enrichment, mutual mistake, and fraudulent inducement present no triable issues of fact. Summary judgment will be granted for defendant on each of the claims.

## CONCLUSION

Plaintiff's motion for summary judgment is hereby denied, and defendant's cross-motion for summary judgment is granted in full. The Clerk is directed to dismiss plaintiff's complaint. No costs.

IT IS SO ORDERED.

---

7. *Complaint,* pp. 9–10.