NATIONAL RURAL UTILITIES COOPERATIVE FINANCE CORPORATION, Plaintiff–Appellant,

v.

The UNITED STATES, Defendant–Appellee.

No. 88–1283.

United States Court of Appeals, Federal Circuit.

Feb. 2, 1989.

Richard C. Tufaro, Milbank, Tweed, Hadley & McCloy, New York City, argued for plaintiff-appellant.

Timothy F. Brown, Commercial Litigation Branch, Dept. of Justice, of Washington, D.C., argued, for defendant-appellee. With him on the brief were John R. Bolton, Asst. Atty. Gen., J. Christopher Kohn, Director and James G. Bruen, Jr., Sp. Litigation Counsel, Washington, D.C.

Before FRIEDMAN, NIES and ARCHER, Circuit Judges.

FRIEDMAN, Circuit Judge.

The principal question in this case, here on appeal from the United States Claims Court, is whether the Rural Electrification Administration (REA) breached a contractual obligation to the appellant, National Rural Utilities Cooperative Finance Corporation (the Cooperative), contained in an agreement between REA and the Wabash Valley Power Association, Inc. (Wabash), whereby a prior mortgage that Wabash had given REA would be modified to secure a loan the Cooperative was to make to Wabash. The answer depends upon whether Wabash satisfied a provision in that agreement that required Wabash to obtain approval by a State regulatory commission of the loan and the mortgage modification.

The Claims Court held that Wabash had not satisfied that provision, and granted summary judgment dismissing the Cooperative's suit for damages against the United States based on REA's alleged breach of the agreement. *National Rural Utils.*

*Coop. Fin. Corp. v. United States,* 14 Cl.Ct. 130 (1988). We affirm.

## I

A. This appeal grows out of a complex arrangement between the Cooperative, its member Wabash, and Wabash's creditor and security holder REA, for the financing of debt incurred during the construction of the now defunct Marble Hill Nuclear Generating Plant.

In 1978, Wabash joined with Public Service Company of Indiana to finance construction of the generating plant. Wabash obtained funds for the project through borrowings from the Department of the Treasury's Federal Financing Bank (Treasury Bank). The Treasury Bank's loan (which totaled $466.7 million) was secured by a mortgage held by REA on all of Wabash's assets. Loan repayment was deferred for seven years with accumulated interest added to the principal. REA guaranteed payment to the Treasury Bank if Wabash defaulted on its loan payments once they began to accrue.

In 1984, the Public Service Company of Indiana withdrew from the Marble Hill project, and construction was suspended. REA then demanded that Wabash begin meeting its quarterly interest payments on the Treasury loan as of March 31, 1984. Lacking funds to make the March payment, Wabash requested the government to advance additional funds. REA agreed to advance the funds if Wabash agreed to file a petition with the Public Service Commission of Indiana (Commission) for a 51 percent rate increase. REA also advised Wabash to seek alternative financing to meet its interim interest payments pending approval of the rate increase.

Wabash filed the rate increase petition and explored the possibility of obtaining unsecured financing. Five banks refused such financing. Wabash then turned to the Cooperative, which on two prior occasions had guaranteed bond issues to enable Wabash to finance projects.

By letter dated June 4, 1984, the Cooperative advised REA that it would make a long-term loan to Wabash of $111 million, which would be sufficient to carry Wabash through a projected three-year phase-in of the rate increase. The Cooperative would make the loan only if REA agreed to provide the Cooperative with a "lien accommodation," whereby REA's mortgage on Wabash's assets would be modified to permit the Cooperative to secure the loan.

On June 27, 1984, REA sent a letter (the lien accommodation letter) to Wabash, stating that REA would grant the lien accommodation to "enable WVPA [Wabash] to obtain financing from CFC [the Cooperative] in the amount of $53,000,000 to make its debt service payments to the Federal Financing Bank (FFB) through March 31, 1985." The letter, which the parties stipulated contained "[t]he only binding commitment, if any, of REA to provide a lien accommodation for the proposed loan from CFC to Wabash," conditioned the lien accommodation upon Wabash's acceptance of several covenants. At issue in this case is the one in which Wabash agreed that

> it will: ...
>
> -obtain all necessary regulatory body approvals of the lien accommodation and the CFC loan.

Also pertinent are the covenants in which Wabash agreed that

> it will: ...
>
> -continue to use its best efforts to have into effect by April 1, 1985, rates necessary to meet all of its financial requirements.
>
> -obtain written REA approval of all advances from the CFC loan.

The letter further stated that "[c]ontinued satisfaction of the above covenants will be evaluated by REA prior to each future advance" and that "[t]his approval is given with the understanding that the terms and conditions of the CFC loan must be satisfactory to REA." The letter concluded by requesting that Wabash indicate its acceptance of the arrangement by signing the acknowledgment portion of the letter and returning a copy to REA. The letter further stated that "[t]his acceptance must be received for REA to approve the first advance from the CFC loan." The parties

have stipulated that "[t]he terms and conditions of the [lien accommodation] letter were never modified or waived."

Wabash signed this letter on June 29, 1984, thereby accepting it "as an amendment to [Wabash's] Loan Contract with REA."

Wabash's next quarterly interest payment was due on July 2, 1984, five days after Wabash received the lien accommodation letter. Wabash had only enough cash on hand to make one-third of the payment. Wabash requested the Cooperative to advance two-thirds of the payment due—approximately $8.0 million. It was apparent that the "necessary regulatory body approvals of the lien accommodation and the CFC loan" by the Commission could not be obtained in time to meet the July 2nd payment deadline. 14 Cl.Ct. at 133.

The Cooperative agreed to advance $8.6 million ($8.0 million of which would be used to make the July debt service payment and the remaining $0.6 million to cover the Cooperative's charge for providing financing) as a short-term unsecured loan (the July 2nd advance). In fulfillment of one requirement of the lien accommodation letter, the Cooperative sought and obtained REA's written approval of the proposed advance on the day (July 2nd) the payment was due at the Treasury Bank.

That same day (July 2nd) a loan agreement between Wabash and the Cooperative was finalized. The Cooperative agreed to make, upon Wabash's request, "Advances" of funds in an amount not to exceed an initial commitment of $9,610,370 (which included the $8.6 million to be advanced that same day) and a total commitment of $53,-000,000. Wabash could elect not to borrow all or any portion of the Cooperative's commitment.

Wabash's obligation to repay any funds advanced was reflected in two notes attached to the loan agreement, a "Short-Term Note" covering the initial commitment and a "Long-Term Note" covering the total commitment. The Short-Term Note was unsecured and would be payable in one year, unless, prior to September 30, 1984, Wabash obtained Commission approv-al to execute the Long-Term Note attached to the loan agreement and a Supplemental Mortgage. If such Commission approval were obtained, the balance outstanding under the Short-Term Note would be included in the secured Long-Term Note. The Long-Term Note had the legend "$53,000,-000" on the upper left-hand corner, and provided that "[Wabash] promises to pay ... the sum of the aggregate unpaid principal amount of all Advances made by [the Cooperative] pursuant to the Loan Agreement."

A copy of the loan agreement between Wabash and the Cooperative was submitted to REA on July 2, 1984 for approval, which REA provided by letter to the Cooperative that same day. In that letter REA informed the Cooperative that REA's approval satisfied the requirement of the lien accommodation letter "that the terms and conditions of the CFC loan were satisfactory to REA." In the last paragraph, REA stated: "It should be noted that all conditions prerequisite to the lien accommodation have not been satisfied to date." The principal condition remaining was that Wabash obtain Commission approval of "the lien accommodation and the CFC loan."

On July 3, 1984, the Cooperative wired $8 million to the Treasury Bank in partial payment of Wabash's July 2nd interest obligation.

On July 6, 1984, Wabash petitioned the Commission "seeking authority from [the] Commission to borrow approximately $53,-000,000 from the [Cooperative], on a long-term basis ... [and for] authority to execute a Supplemental Mortgage and other documents necessary to secure such notes." In its petition Wabash stated that it "is requesting authority to borrow money from [the Cooperative] in order that it may make its debt service payments until such time as [Wabash] has obtained the authority of this Commission to place rates in effect which will generate sufficient revenues to make such debt service payments." By an order dated September 28, 1984, the Commission granted Wabash's petition in part. The Commission authorized Wabash to borrow $12.5 million to

meet its October 1, 1984 interest payment. The Commission scheduled a hearing for November 7, 1984, to consider the balance of Wabash's request.

Upon reviewing the Commission's order, the Cooperative informed Wabash that it would not advance funds for the October 1, 1984 payment, in part because the order had not expressly granted Wabash the authority to execute a supplemental mortgage securing the loan. By an October 10, 1984 resolution of its Board of Directors, Wabash decided not to seek additional financing from the Cooperative or to pursue further its petition for Commission approval of the $53 million long-term loan and supplemental mortgage.

On October 15, 1984, the Cooperative requested Wabash to obtain the Commission's authorization to convert the July 2nd unsecured advance into a long-term secured note. The Cooperative informed Wabash that unless the advance was so converted, repayment would be due by June 30, 1985. On November 29, 1984, REA informed the Cooperative that even if the Commission approved the conversion, it would not provide a lien accommodation for the $8.6 million advance.

REA stated that "the lien accommodation was predicated on [Wabash's] obtaining the entire $53 million loan from [the Cooperative] to meet the Marble Hill debt service payments through March 31, 1985. It was anticipated [Wabash] would have by that time obtained Commission approval of a rate sufficient to meet its full revenue requirements. Now that [Wabash] has withdrawn the petition for Commission approval of the $53 million loan there is no basis for granting a lien accommodation for a part of the approved plan."

On November 2, 1984, Wabash requested that the Commission authorize the conversion of the July 2nd advance. A hearing was scheduled on December 11, 1984, to consider Wabash's request. At that hearing, Richard B. Bulman, a loan officer of the Cooperative (who had received the November 29, 1984 letter from REA referred to above), testified that "commitments have been made among [the Cooperative], REA,

and [Wabash] for the accommodation by the REA of a mortgage of [Wabash's] property to secure the conversion of the [Cooperative's] short-term loan to [Wabash] to a long-term obligation, and that [he] expected the REA to keep that commitment." On January 16, 1985, the Commission authorized Wabash to convert its Short–Term Note to a new Long–Term Note and to execute a supplementary mortgage and security agreement to secure the note.

The Cooperative then requested REA to reconsider its refusal to provide a lien accommodation to secure the July 2 advance. REA refused.

The Commission never approved Wabash's request for a 51 percent rate increase. On May 23, 1985, Wabash filed for a Chapter 11 reorganization in the Bankruptcy Court. As Wabash's guarantor, REA made the October 1, 1984 interest payment.

B. The Cooperative filed suit in the Claims Court, alleging that REA had breached its contractual commitment to provide a lien accommodation covering the $8 million the Cooperative had paid to the Treasury Bank on July 3, 1984 on behalf of Wabash. The complaint sought damages of $8 million based upon various legal theories.

On cross-motion for summary judgment, the Claims Court granted the government's motion and dismissed the complaint. The court agreed with the parties that the lien accommodation letter was unambiguous and could be interpreted without resort to parol evidence. The court then rejected the government's contention that the lien accommodation letter "did not create any contractual relationship with CFC [the Cooperative], since the letter was addressed to Wabash and limited acceptance of REA's offer of a lien accommodation to Wabash." 14 Cl.Ct. at 137. The court ruled:

[A] contractual relationship arises between the government and a private party if promissory words of the former induce significant action by the latter in reliance thereon. REA's letter of June 27, 1984, contained not only the promise

to accommodate the government's lien to facilitate a CFC loan to Wabash, subject to the stated conditions, but also the promise to grant such accommodation *in favor of CFC*. CFC was entitled to rely on this promise in deciding on its course of action with respect to the proposed loan to Wabash.

In effect, REA's letter constituted a unilateral offer of a contract to CFC, inviting acceptance by CFC not in the form of a return promise, but rather in the performance of the act(s) called for therein. CFC accepted the offer by signing the loan agreement with Wabash and advancing $8,602,151 under the terms of the Initial Commitment. [Emphasis in original.]

*Id.* at 137 (citations omitted).

On the merits, the court held that Wabash's failure to obtain Commission approval for the full $53 million loan relieved REA of any obligation to grant the lien accommodation. *Id.* at 140. The court stated:

Approval of the lien accommodation was conditioned, *inter alia*, on Wabash's acceptance of four covenants, the fourth of which provided that Wabash *"will obtain* all necessary regulatory body approvals of the lien accommodation and the *CFC loan."* The only loan discussed in REA's letter was "in the amount of $53,000,000", and it was in this amount that Wabash sought authorization from Indiana PSC [Public Service Commission] in its petition of July 6, 1984. Indiana PSC declined to authorize a long-term loan of $53 million in its order of September 28, 1984, however, and thereafter Wabash withdrew its request for approval of a loan in that amount. Thus, Wabash failed to obtain the regulatory body approval necessary for the CFC loan on which REA's lien accommodation was predicated. [Emphasis in original.]

14 Cl.Ct. at 138.

The court further noted that Wabash had not only failed to satisfy the condition in the June 27th letter, but also had not complied with conditions in its loan agreement with the Cooperative which, when approved by REA, became incorporated into the lien accommodation agreement for securing the July 2nd advance. The court stated:

The unequivocal language of the CFC/Wabash loan agreement, as stipulated above, set[s] two conditions for the securing of CFC's [the Cooperative] advance to Wabash under the Short–Term Note in July 1984: (1) that the Indiana PSC [Public Service Commission] authorize Wabash "to execute the Long–Term Note attached to the July 2 loan agreement and a Supplemental Mortgage" and (2) that Wabash obtain such authorization "prior to September 30, 1984." The Long–Term Note attached to the loan agreement was in the amount of $53 million, and Indiana PSC did not approve Wabash's execution of this note either before September 30, 1984, or at any time thereafter. Thus, the terms of the loan agreement approved by REA on July 2, 1984, setting forth the conditions for securing CFC's $8.6 million advance, were not met.

14 Cl.Ct. at 139.

The Court concluded

that the conditions set forth in REA's letter of June 27, 1984, for the granting of a lien accommodation in favor of [the Cooperative] were not satisfied. The unambiguous terms of that letter, together with the CFC/Wabash loan agreement referenced therein and approved by REA, provided that the $53 million Long–Term Note attached to the loan agreement be approved by Indiana PSC prior to September 30, 1984, and executed by Wabash before REA was obligated to execute a supplemental mortgage granting a lien accommodation. Unsecured advances under the Short–Term Note could become secured only by rolling them over into advances under the Long–Term Note, provided approval for the Long–Term Note was obtained.

14 Cl.Ct. at 140.

## II

The government here repeats the argument, which the Claims Court rejected, that the Cooperative was not a party to the

agreement between REA and Wabash and therefore could not sue the United States for REA's alleged breach of that agreement. The government relies on the fact that the lien accommodation letter (which the parties stipulated constituted the only possible binding commitment by REA to grant the lien accommodation) was directed solely to Wabash and not to the Cooperative.

■ We agree with the Claims Court that the Cooperative has the right to sue the United States for REA's alleged breach of the lien accommodation letter. The Claims Court treated that letter as a unilateral offer by REA to grant a lien accommodation to the Cooperative if the latter made the loan to Wabash, which the Cooperative accepted by partial performance. Moreover, the Cooperative may be viewed as a third-party beneficiary of the arrangement between REA and Wabash. As the Claims Court noted, the lien accommodation letter "was predicated on undertakings of CFC [the Cooperative] as well as Wabash, and would confer benefits on CFC [the Cooperative] as well as Wabash." 14 Cl.Ct. at 137.

### III

Based on the facts set forth in part I–A, several points are not in dispute: (1) The parties recognized that Wabash would require a loan to enable Wabash to meet its interest payments until it could obtain approval for a rate increase adequate to put its finances on a sound basis; (2) the Cooperative's initial offer, which it based on a projected three-year phase-in of the rate increase, was for a commitment of $111 million; (3) the Cooperative would not lend money on a long-term basis to Wabash unless REA accommodated its existing liens on Wabash's property; (4) REA agreed to grant the lien accommodation to enable Wabash to obtain funds sufficient for it to meet its debt service payments through March 31, 1985, which REA deemed a sufficient period of time for Wabash's rate increase request to be approved; (5) the parties contemplated and intended that Wabash would seek from the

Commission authority to obtain total loans in the amount necessary to meet the debt service payments for that period of time, and authority to execute a supplemental mortgage to secure such loans; and (6) REA, Wabash, and the Cooperative, who worked closely together in arranging and structuring the proposed loan, recognized that no long-term secured loan would be possible without the approval of the Commission.

It is in the light of these considerations that Wabash's contractual commitment in the lien accommodation letter to obtain Commission approval "of the lien accommodation and the CFC loan" must be analyzed and interpreted. The question is whether the parties intended that REA would give the Cooperative a lien accommodation only if Wabash obtained Commission authorization to borrow the amount it would need until a rate increase was approved, or whether the parties intended that conversion of the July 2nd advance into a long term loan would be sufficient. The answer depends upon what the parties contemplated by the term "CFC loan," the loan for which Commission approval was required.

The Claims Court concluded that the "CFC loan" referred to a loan "in the amount of $53,000,000" because "[t]he only loan discussed in REA's letter was 'in the amount of $53,000,000,' and it was in this amount that Wabash sought authorization from Indiana PSC in its petition of July 6, 1984." 14 Cl.Ct. at 138.

■ Based upon the documents and other evidence in the record, we hold that the "CFC loan" for which Commission approval was required unambiguously refers to a commitment by the Cooperative to make a total loan in an amount sufficient to allow Wabash to meet its debt service payments through March 31, 1985, namely $53 million. We reach this conclusion because (1) the stated purpose of the lien arrangement was to "enable [Wabash] to obtain financing from [the Cooperative] in the amount of $53,000,000 to make its debt service payments to the [Treasury Bank] through March 31, 1985;" (2) the parties recognized that Wabash would need a total loan in

that amount for debt service payments during the following year; (3) the loan agreement between Wabash and the Cooperative contemplated a total commitment by the Cooperative of $53 million, which Wabash could draw-down upon in making its debt service payments; and (4) $53 million was the amount for which Wabash initially sought authorization from the Public Service Commission to borrow on a long-term basis.

Our reading of the lien accommodation letter, in light of the surrounding circumstances, is that REA's obligation to provide a lien accommodation was predicated on more than Wabash's obtaining regulatory approval to convert the July 2nd advance into a long-term secured note. The stated purpose of the lien accommodation letter, as noted above, and the letter's requirement that Wabash "continue to use its best efforts to have into effect by April 1, 1985, rates necessary to meet all of its financial requirements," indicated that the lien arrangement was tied to and an integral part of the parties' efforts to secure a source of financing that Wabash could use until it obtained approval for the planned rate increase. Other provisions of the letter, stating that "Wabash will ... obtain written REA approval of all advances from the CFC loan" and that "acceptance [of the agreement] must be received for REA to approve the first advance from the CFC loan," indicate that the parties understood and intended that the "CFC loan" meant more than a single advance.

In addition, the conditions for obtaining the July 2nd advance, set forth in the loan agreement between the Cooperative and Wabash, leave no doubt that the Cooperative contemplated and intended that the July 2nd advance would remain unsecured, as a Short–Term Note payable in one year, unless Wabash obtained Commission approval to execute the Long–Term Note which was attached to the loan agreement and a Supplemental Mortgage to secure that Note. The attached Long–Term Note was for $53 million.

The Cooperative argues that REA did not require Commission authorization to borrow the full $53 million because the loan agreement did not obligate Wabash to borrow that amount but only to periodically request (after which the Cooperative would be required to extend) advances up to a maximum of $53 million. The government, however, has given a reasonable explanation why REA would require Commission approval of the entire loan before it would grant a lien accommodation, even though Wabash would obtain the money in quarterly installments. As the government has stated, REA so conditioned a lien accommodation because it wanted to insure a long-term permanent solution of Wabash's financial problems. The parties understood and intended that, once Commission approval were obtained for the full $53 million, Wabash would request from the Cooperative, and the Cooperative would make, as many advances as Wabash would need until the proposed rate increase was obtained. The total of the advances was expected to be $53 million.

Alternatively, the Cooperative contends that the lien arrangement contemplated a divisible performance whereby Commission approval would be obtained only for each advance, and that this requirement was satisfied when the Commission approved Wabash's request to convert the July 2nd advance into a long-term secured note. The Cooperative relies on a provision in the lien accommodation letter which states: "[c]ontinued satisfaction of the above covenants will be evaluated by REA prior to each future advance." In view of the other contractual provisions discussed above, we do not think that these words, standing alone, properly may be read as reflecting an understanding that Wabash was only required to obtain piecemeal Commission approval of each advance under the CFC loan. Read in context, that provision provides only that REA would be entitled to evaluate Wabash's satisfaction of the letter's covenants before REA approved an advance under the CFC loan.

In sum, we conclude that a fair reading of the documents and other evidence in the record shows that the parties intended that REA would provide a lien accommodation

only upon the condition that Wabash obtain authorization from the Commission to borrow the full amount that Wabash would ultimately need to make its interim payments ($53 million) and authority to execute a supplemental mortgage that would secure that loan. Since Wabash never obtained the necessary Commission authorization, REA did not breach its contractual obligation to grant a lien accommodation to cover the $8.6 million the Cooperative advanced to Wabash.

None of the cooperative's other arguments, which we have fully considered but find it unnecessary to discuss, is persuasive.

## CONCLUSION

The judgment of the United States Claims Court dismissing the complaint is AFFIRMED.