Gerald J. BUESING, Plaintiff,

v.

UNITED STATES, Defendant.

No. 96–70T.

United States Court of Federal Claims.

Sept. 7, 2000.

Jeffrey A. McKee, Davis, McKee & Forshey, P.C., Phoenix, Arizona, attorney of record for plaintiff.

Elizabeth Diane Seward, Court of Federal Claims Section, Tax Division, Department of Justice, Washington, D.C., with whom were Steven I. Frahm, Assistant Chief, Court of Federal Claims Section, and Mildred L. Seidman, Chief, Court of Federal Claims Section, attorneys of record for the defendant.

## *OPINION*

HORN, Judge.

The above-captioned case is before the court after a trial on the merits. Plaintiff, Gerald J. Buesing, alleges that he entered into a contract with the defendant, the United States, under which a federal tax lien on his home would be released if (1) he converted his bankruptcy to a Chapter 7 proceeding, (2) he received a discharge from his bankruptcy, and (3) he paid $30,000.00 to the Internal Revenue Service. The United States argues that no contract was ever formed, and, if a contract had been formed, it would be voidable because of a material misrepresentation by the plaintiff and/or a unilateral mistake on the part of the defendant. Defendant's allegations of a material misrepresentation and a unilateral mistake both stem from plaintiff's conduct in leading defendant to believe that plaintiff would keep his home, which purportedly caused defendant to underestimate the value of plaintiff's home, and, hence, the value of plaintiff's equity interest in the home. Plaintiff, in turn, counters that defendant would be equitably estopped from denying the existence of a contract.

After the trial on these issues and the submittal of post-trial briefs, the court concludes that no contract was formed. Had a contract been formed, the court agrees with defendant that any agreement would have been voidable due to both a material misrepresentation on the plaintiff's part and a unilateral mistake on the defendant's part. In addition, the court holds that the government would not be estopped by its actions from denying the existence of the contract.

## *FINDINGS OF FACT*

Plaintiff, Gerald J. Buesing, founded a trucking company with his brother in 1965. The trucking company evolved into a construction company called Buesing Corporation, of which plaintiff is the sole owner and president. In 1986, plaintiff decided to move the company to Phoenix, Arizona, from its previous place of business in Minnesota.

On March 10, 1990, Gerald Buesing married Laura Michael.[1] At the time of their marriage, the market value of plaintiff's assets exceeded $4.3 million, while Ms. Michael's assets were worth about $30,000.00. On the day before the marriage, plaintiff and Ms. Michael entered into an Antenuptial Agreement. Paragraph 3 of the Antenuptial Agreement stated:

> *Termination of Marriage by Dissolution....* In consideration of the sum of $25,000 to be paid by Mr. Buesing to Ms. Michael at the time either party would initiate an action for divorce or separate maintenance, Ms. Michael hereby waives and relinquishes all statutory rights to temporary or permanent alimony, support, or maintenance, allowance for costs of an action for divorce or separate maintenance, property settlement and all other allowances from one another's assets in any such action.

Initially, the Buesings lived in Ahwatukee, Arizona, in a house which plaintiff had purchased in 1989 with his own funds, and which was titled solely in his name. In March 1993, plaintiff and Ms. Michael purchased, as husband and wife, a residence at 1917 East Clubhouse Drive in Phoenix, Arizona (the Clubhouse Drive property) for $321,562.00. The parties agree that the couple took title to the property as joint tenants with right of survivorship and not as a community property estate or as tenants in common. Plaintiff made the down payment with $100,000.00 of the net proceeds from the sale of the Ahwa-

---

1. Subsequent to the events of this case, Laura Michael remarried and now uses the surname Booras. For ease of reference, the court will refer to her as Laura Michael, or Ms. Michael, throughout this opinion.

tukee home, and he also made the monthly mortgage payments.

In May of 1993, soon after purchasing the Clubhouse Drive property, the Buesings' marriage began to dissolve. They separated on or about July 17, 1993, when Laura Michael moved to Chicago, Illinois. On that same day, plaintiff wrote to Ms. Michael and asked that she sign and have notarized three documents: (1) a quit claim deed relinquishing to plaintiff all of her right, title and interest in and to the Clubhouse Drive residence, (2) a power of attorney, and (3) a waiver of any conflict that might arise from the representation of plaintiff in any divorce proceedings by the law firm of Mariscal, Weeks.[2] On July 26, 1993, Ms. Michael signed the power of attorney and the waiver, but she did not sign the quit claim deed.

On August 24, 1993, using the power of attorney which his wife had executed, plaintiff signed and recorded in Maricopa County, Arizona, a quit claim deed for himself and on behalf of Ms. Michael, which was identical in substance to the quit claim deed which she had declined to sign.[3] Plaintiff did not inform Laura of the purported conveyance. Later, Plaintiff was advised by counsel that the quit claim deed was probably not enforceable, and that Laura held an undivided one-half community property interest in the Clubhouse Drive residence.

Ms. Michael filed a divorce petition in Maricopa County, Arizona on September 21, 1993. In a letter of the same date to plaintiff's attorney, Ms. Michael demanded immediate payment of the $25,000.00 provided for in the Antenuptial Agreement, or at least a portion of that sum along with monthly payments to enable Ms. Michael to meet her living expenses.

Meanwhile, on October 19, 1993, the Internal Revenue Service (IRS) recorded a Notice of Federal Tax Lien in Maricopa County, Arizona respecting assessed and unpaid income taxes, penalties and interest totaling $105,369.00 that plaintiff owed for taxable years 1987 through 1989. The federal tax lien attached to all of plaintiff's real and personal property. The taxes had originally been assessed on July 21, 1992 following an IRS audit, and notice and demand for payment had been made by the IRS a total of five times over the course of the following year.

During the following months, the Buesings continued to exchange correspondence through their attorneys as they attempted to reach a divorce settlement. Each of plaintiff's proposals, among other terms, would have resulted in plaintiff receiving the Clubhouse Drive property as his separate property. During the negotiations, Mr. Buesing consistently maintained to his divorce attorney, Cindra White, that Ms. Michael had no interest in the residence, and that it was his separate property.

During the course of the divorce negotiations, on January 18, 1994, plaintiff filed a petition under Chapter 11 of the United States Bankruptcy Code seeking protection from his creditors. In March 1994, plaintiff's bankruptcy case was assigned to Revenue Officer William Unger of the IRS for resolution of plaintiff's unpaid income taxes for 1987 through 1989. Mr. Unger met with plaintiff and his attorney on March 22, 1994 to discuss the unpaid taxes and plaintiff's options for repayment, which depended on whether the income tax liability was dischargeable.[4] Mr. Unger explained that, if

---

**2.** William Novotny, a partner at Mariscal, Weeks, already had been advising the Buesings with respect to a contemplated filing for bankruptcy.

**3.** That same day, August 24, 1993, plaintiff recorded a Declaration of Homestead for the Clubhouse Drive property. Under Arizona law, the Declaration exempted up to $100,000.00 of equity in the residence from attachment, execution, or forced sale.

**4.** A discharge in bankruptcy operates to prohibit the IRS from collecting a tax debt as a personal liability of the taxpayer pursuant to 11 U.S.C.

§ 524(a)(2) (1994), which addresses the "Effect of Discharge:"

(a) A discharge in a case under this title—

\* \* \* \* \* \*

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived; . . .

However, the debtor's property, including the plaintiff's exempt property such as the Clubhouse

the liability was determined to be dischargeable, the federal tax lien then would be satisfied by the equity in plaintiff's real and personal property after his discharge from bankruptcy. Unger explained that plaintiff could make an offer in settlement of his tax liabilities under a Chapter 11 bankruptcy or, alternatively, he could convert to a Chapter 7 bankruptcy liquidation proceeding, obtain a discharge, and then satisfy the still-attached tax lien.

With respect to the divorce, plaintiff contacted his divorce attorney, Cindra White, on August 3, 1994, and informed her that his wife wanted to finalize the divorce. He instructed the attorney to draft a decree of dissolution under which the Clubhouse Drive residence would have been listed as his separate property, Ms. Michael would have received the Antenuptial Agreement payment of $25,000.00, and various items of community property would have been identified as the separate property of either plaintiff or of his wife. The next day, Ms. White prepared a draft Consent Judgment with these terms, but the settlement was not resolved at that time because Mr. Buesing did not have $25,000.00 available to make the payment to Ms. Michael. He told Ms. Michael that he would be able to pay her when the house was sold.

Meanwhile, for several months, Revenue Officer Unger had focused his work with respect to plaintiff's case on the question of whether the income tax liability was dischargeable. Revenue Officer Unger notified plaintiff's counsel, Jeff McKee, by letter dated January 23, 1995, that plaintiff's income taxable years 1987 through 1989 met the requirements for discharge from personal liability in his Chapter 11 proceeding. Revenue Officer Unger stated that after the Bankruptcy Court issued an order discharging the taxes, and collection was made from plaintiff's equity in his real and personal property

to which the federal tax lien attached, any remaining tax debt would be abated.

Plaintiff initiated discussions with the IRS to determine the extent and value of the real and personal property to which the federal tax lien respecting his 1987 through 1989 tax liabilities could attach. Upon Revenue Officer Unger's request, plaintiff provided to the IRS information and documentation regarding the value of his business, automobile, and residence. With regard to the value of the Clubhouse Drive residence, plaintiff provided comparable sales information to the IRS showing that similarly situated residential property had a market value of $300,000.00. During the negotiations, plaintiff represented to the IRS that his wife had a one-half interest in the Clubhouse Drive property, pursuant to Arizona community property law. Plaintiff also represented to Revenue Officer Unger that he wanted to keep his home. Based on the comparable sales figures and plaintiff's representation that Ms. Michael held a one-half interest in the Clubhouse Drive property, Revenue Officer Unger believed that the value of plaintiff's real and personal property to which the federal tax lien could attach was $30,000.00. Mr. Unger assigned no value to plaintiff's household furnishings, based on a bankruptcy schedule on which plaintiff had listed the fair market value of the furnishings at the exemption amount of $2500.00.

Plaintiff, by letter dated March 8, 1995, made alternative offers to the IRS to secure the release of the federal tax lien in dispute. The offer at issue in the instant case provided that plaintiff would pay the IRS $30,000.00 within 90 days of IRS acceptance of plaintiff's offer to buy out the federal tax lien on his property. The letter, written by plaintiff's counsel, Mr. McKee, states:

> This correspondence is to confirm that the Internal Revenue Service has determined and agreed that Mr. Buesing is

---

Drive residence in the instant action, remains liable for a debt secured by a tax lien of the IRS pursuant to 11 U.S.C. § 522(c)(2)(B) (1994) which addresses "Exemptions:"

(c) Unless the case is dismissed, property exempted under this section is not liable during or after the case for any debt of the debtor that arose, or that is determined under section 502

of this title as if such debt had arisen, before the commencement of the case, except—

\* \* \* \* \* \*

(2) a debt secured by a lien that is—

\* \* \* \* \* \*

(B) a tax lien, notice of which is properly filed; . . .

entitled to a discharge regarding, and is relieved of personal liability for, personal income tax liabilities for the tax years 1987, 1988 and 1989, subject to obtaining an Order Granting Discharge from the Bankruptcy Court. For ease of reference and your acknowledgment and understanding, I have enclosed your letter dated January 23, 1995 stating and acknowledging that the IRS will not contest the dischargeability of Mr. Buesing's Form 1040 tax liabilities for the years 1987, 1988 and 1989.

This shall also constitute an offer in compromise of all Federal Tax Levies and Liens on Mr. Buesing's real and personal property, including (but limited to) his equity in his personal residence and the value of his stock in Buesing Corporation. As you know, these Federal Tax Levies and Liens encumber Mr. Buesing's real and personal property to the extent of the above-referenced 1987, 1988 and 1989 tax liabilities.

In full satisfaction, extinguishment, and release of these Federal Tax Levies and Liens, Mr. Buesing makes the following alternative offer:

1. At Mr. Buesing's behest, Buesing Corporation will immediately relinquish to the IRS $100,000.00 of Net Operating Losses (NOLs) which it presently retains, and cooperate in reasonable measures to insure that Buesing Corporation does not attempt to utilize said NOLs; ·or (if, and only if, Option One is not accepted by the IRS).

2. $30,000.00 in cash within 90 days of IRS acceptance, which amount is comprised of $28,600.00 for Mr. Buesing's equity in his home and $1,400.00 representing Mr. Buesing's ownership interest in Buesing Corporation.

We respectfully request a[n] expeditious response to this alternative offer by the IRS. Thank you for your professional courtesies and manner in this proceeding.

On March 15, 1995, prior to receiving any response to his offer and without notice to the IRS, plaintiff signed an agreement with a real estate agent to list the Clubhouse Drive property for sale at $339,900.00. The resi-dence was listed for sale in a Century 21 advertisement run by plaintiff's friends, Alan and Barbara Levanson, which appeared in the Ahwatukee Foothills News on March 22, 1995, and every two weeks thereafter through June 14, 1995.

Two days later, on March 17, 1995, plaintiff informed his divorce attorney, Ms. White, that he and Ms. Michael had reached a basis for settlement. Mr. Buesing asked Ms. White to prepare two different draft Consent Judgments, with both versions increasing the cash payment to his wife to $30,000.00, with $5,000.00 payable on or before March 31, 1995. In both versions, the Clubhouse Drive residence was confirmed as plaintiff's sole and separate property. Plaintiff also told Ms. White that he had reached an agreement with the IRS concerning his unpaid taxes, and he advised her that he would need to sell the Clubhouse Drive property. For the rest of that month, while agreeing in principal on the sum to be paid to Ms. Michael, plaintiff and his wife continued to negotiate the payment's timing.

While plaintiff was finalizing his divorce settlement, plaintiff's attorney McKee continued to discuss plaintiff's outstanding tax debt with Revenue Office Unger. The two held discussions several times between March 8, 1995 and March 28, 1995. Mr. Unger restated that, in order to secure a release of the federal tax liens, plaintiff first had to obtain a discharge from his Chapter 7 bankruptcy, and then pay the $30,000.00 amount estimated as the value of the IRS's lien interest. On March 15, 1995, Mr. Unger discussed plaintiff's case with his Section Chief, Ed Perry. Based on the information then available to Mr. Unger, including plaintiff's intent to keep his residence, Mr. Perry approved Mr. Unger's recommendation that plaintiff be allowed to buy out the tax lien for $30,000.00.

As of March 28, 1995, Mr. Unger was unaware that Ms. Michael had tentatively agreed to the divorce settlement amount, and he was also unaware that plaintiff had listed the Clubhouse Drive residence for sale. On that day, Revenue Officer Unger formally responded to plaintiff's tax settlement offer by letter, wherein Mr. Unger agreed that the

value of the real and personal property to which the federal tax lien attached was $30,-000.00. He stated that following plaintiff's discharge from a Chapter 7 proceeding and plaintiff's payment of $30,000.00, plaintiff's remaining tax liabilities for 1987 through 1989 would be abated and the lien released. The letter from the IRS, signed by Revenue Officer Unger, stated:

> The Internal Revenue Service agrees that the value of the real and personal property to which our Notice of Federal Tax Liens attach is $30,000.00. Following Chapter 7 discharge by the court and receipt of $30,-000.00, the 1987, 1988, and 1989 income tax liabilities of the debtor will be discharged and the Notice of Federal Tax Liens will be released.

> This is a procedure that has several steps involving several people, so the actual release will not appear at the county recorders office for about 4 weeks after the discharge and money are received. Payment should be made directly to this office to minimize delay.

The letter did not refer to plaintiff's March 8, 1995 letter, nor did it refer to the 90-day period in which plaintiff offered to make a lump sum payment of $30,000.00 to satisfy the lien interest of the IRS in his real and personal property.

On April 12, 1995, the Maricopa County Superior Court entered a consent judgment and decree of dissolution of the marriage of Gerald Buesing and Laura Michael. The consent judgment stated that the Clubhouse Drive property was plaintiff's sole and separate property and was confirmed to him. The consent judgment provided further that plaintiff was to pay Ms. Michael $5,000 on or before March 31, 1995, and $25,000.00 upon the sale of the Clubhouse Drive property. In March 1995, at the time of the exchange of letters between plaintiff and the IRS respecting the buy-out of the IRS lien on plaintiff's property, plaintiff's bankruptcy proceeding was still in Chapter 11.

Plaintiff interpreted Revenue Officer Unger's March 28, 1995 letter as an acceptance of plaintiff's offer contained in his March 8, 1995 letter, with the additional requirement, developed in interim conversations between Mr. Unger and Mr. McKee, that plaintiff first had to obtain a Chapter 7 discharge. Revenue Officer Unger, however, considered his March 28, 1995 letter to be a separate proposal or counteroffer which stated an additional, material term.

On April 26, 1995, the bankruptcy court entered an order converting plaintiff's case to a Chapter 7 proceeding. The reason stated for the conversion was that the plaintiff had failed to file a disclosure statement and plan of reorganization by January 31, 1995, the date stipulated to by the plaintiff and the United States Trustee. On May 17, 1995, plaintiff received an offer of $340,000.00 for the Clubhouse Drive property, including its furnishings. Mr. Buesing accepted the offer on May 20, 1995; closing was scheduled for June 16, 1995.

Mr. Unger first learned of the property's sale on June 13, 1995. On June 15, 1995, one day before plaintiff was to close on the sale, plaintiff's attorney McKee called the IRS to inform them. In order for the sale to close, plaintiff asked the IRS to release its lien on the property and to accept $30,000.00 cash from the sale proceeds.[5]

On June 16, 1995, plaintiff attempted to tender to the IRS a cashier's check for $30,000.00 to secure a release of the lien on the Clubhouse Drive property. The IRS refused to accept the check. Revenue Officer Unger, by letter dated June 19, 1995, notified plaintiff's counsel that he was withdrawing his March 28, 1995 proposal to release the lien on plaintiff's property if plaintiff obtained a discharge from his Chapter 7 bankruptcy proceeding and paid $30,000.00. Revenue Officer Unger stated:

> Some of the information provided during our discussions is now known to be incorrect. Mr. Buesing indicated that his wife

---

5. Plaintiff understood that the IRS was not required to release its lien because he had not obtained a discharge from the Chapter 7 proceeding. On June 14, 1995, plaintiff had filed an emergency motion with the bankruptcy court to abandon the exempt homestead (Clubhouse Drive) property from the Chapter 7 estate. On the same date, the court had entered an order abandoning the Clubhouse Drive property from plaintiff's estate.

held a 50% interest in the real property. The recent review of sale documents shows that her interest is limited to $25,000. This significantly increases your client[']s interest and our lien interest in the property. The estimated value was based on comparables you provided. This recent offer to purchase at $330,000 indicates that those values were too low. The net effect of these two factors changes our lien interest from $30,000.00 to $83,000.00.

There are two entirely different actions being discussed here. They cannot be combined. In the event Mr. Buesing receives a discharge one set of laws apply. If he still [owns] his home, then a negotiated value is a reasonable means to determine our secured interest in the exempt property without forcing its sale. That discharge is key. Without it, the actual sale of the home determines the value of our lien. . . .

The sale of plaintiff's home closed on June 30, 1995. Sale proceeds of $25,000.00 were paid to Laura pursuant to the Antenuptial Agreement and Consent Judgment. Net sale proceeds of $77,943.05 were deposited in escrow with United Title Company pursuant to 26 U.S.C. § 6325(b)(3) (1994).[6] On October 16, 1995, United Title remitted to the IRS a check in the amount of $78,543.91, including $600.86 in accrued interest. On the same day, plaintiff's income tax liabilities for 1987 through 1989 were credited as follows: $11,124.06 for 1987; $46,215.50 for 1988; and $21,204.35 for 1989. The credits to 1987 and 1989 satisfied plaintiff's tax liability for those years, but about $31,000.00 of plaintiff's tax liability for 1988 remained unpaid. On October 27, 1995, the IRS issued a Certificate of Discharge, discharging the Clubhouse Drive residence from the federal tax lien.

On January 10, 1996, the bankruptcy court released plaintiff from all dischargeable debts, including his remaining unpaid income tax liability for 1988, and discharged him from his Chapter 7 proceeding. On September 16, 1996, plaintiff's remaining liability for 1988 income taxes was abated.

The complaint in the instant action was filed in the United States Court of Federal Claims on February 7, 1996. Plaintiff contends that he had a contractual agreement with the IRS by which the federal tax lien on his real and personal property would be removed upon his payment to the IRS of $30,000.00. Mr. Buesing is seeking to recover the net proceeds in excess of $30,000.00 from the sale of the Clubhouse Drive property. Alternatively, plaintiff seeks damages of $30,000.00, which is the alleged value of his exempt furniture and furnishings which were sold with the Clubhouse Drive residence, plus interest.[7]

After the case was filed, the defendant filed a motion to dismiss arguing that a contract had not been formed between Buesing and the IRS regarding the tax lien, and alleging that plaintiff improperly sought a remedy not available in this court, specifically, declaratory relief or specific performance. In the alternative, the defendant filed a motion for summary judgment, arguing that any contract entered into by the parties was voidable on the grounds that material misrepresentation or unilateral mistake occurred.

The plaintiff responded to the motion to dismiss, and filed a cross-motion for summary judgment asserting that the parties had entered into a contract arising out of a settlement agreement and contending that the plaintiff sought money damages stemming from a failure to perform that contract. Moreover, the plaintiff argued that in the event the court determined there was a con-

---

6. The applicable statute, 26 U.S.C. § 6325, titled "Release of lien or discharge of property," states in relevant part:

 (b) **Discharge of property.**—

 \* \* \* \* \* \*

 **(3) Substitution of proceeds of sale.**—Subject to such regulations as the Secretary may prescribe, the Secretary may issue a certificate of discharge of any part of the property subject to the lien if such part of the property is sold and, pursuant to an agreement with the Secretary, the proceeds of such sale are to be held, as a fund subject to the liens and claims of the United States, in the same manner and with the same priority as such liens and claims had with respect to the discharged property.

7. This relief request was not advanced in the plaintiff's original Complaint, but has been raised in the plaintiff's post-trial briefs.

tract, but found the government's argument regarding material misrepresentation and unilateral mistake worthy of consideration, that summary judgment was not appropriate as facts material to the formation of a contract were genuinely in dispute.

In a decision issued on January 13, 1999, the court granted in part and denied in part defendant's motion to dismiss. *Buesing v. United States,* 42 Fed.Cl. 679, 698 (1999). The court granted the motion to dismiss Mr. Buesing's claims for specific performance and declaratory judgment, because those claims fell outside of the court's jurisdiction. *Id.* at 692. The court, however, denied defendant's motion to dismiss plaintiff's other claims. *Id.* at 691. The court also denied the parties' motions for summary judgment because they were premature due to an underdeveloped record with material issues of fact in dispute. The court stated:

A number of issues of fact have been raised by the parties in papers presented to the court that weigh against resolution of the instant case upon summary judgment pleadings. It appears that there are questions of fact surrounding the impact upon Revenue Agent Unger's understanding of the equity value of the property owned by the plaintiff, Unger's interpretation of plaintiff's intent to retain or sell the house, and how these issues impacted Unger's determinations for settlement negotiation purposes. In addition, there is an issue as to the plaintiff's intent, or stated intent, to reside in or sell the Clubhouse Drive property.

The issues of materiality, mistake and "reason to know" need further examination by a trier of fact. Moreover, insufficient information is available to the court at this time to resolve the issues raised regarding the authority of Revenue Agent Unger to enter into a settlement agreement and the doctrine of equitable estoppel raised by the plaintiff.

*Id.* at 697. Plaintiff's case subsequently went to trial in December, 1999.

## DISCUSSION

The court must address several issues raised by the parties both at trial and in their post-trial briefs. The court must examine whether a contract was formed between the parties through their exchange of letters regarding a possible settlement, or through defendant's letter and the plaintiff's subsequent conduct taken allegedly in reliance on that letter. If a contract was formed, the court also must decide whether the contract is voidable by the government because of alleged material misrepresentations by the plaintiff, or because of unilateral mistake on the part of the government. Last, the court must decide if the defendant is equitably estopped from denying the existence of a contract.

## I. The existence of a contract

The court first examines the question of whether a settlement contract was formed between Mr. Buesing and the IRS. Plaintiff argues that "[t]his is a breach of contract case. A contract was formed when Gerald Buesing offered to settle the value of the tax liens on his property for $30,000 and the IRS accepted that offer." As the basis of an agreement, plaintiff points to (1) the combination of his March 8, 1995 offer letter and the March 28, 1995 letter response from the IRS, and/or (2) the combination of that March 28, 1995 IRS response and subsequent actions which plaintiff allegedly performed, such as converting his bankruptcy proceeding to Chapter 7 and settling his divorce, in reliance on the IRS response. According to defendant, however, no contract was ever formed:

[T]here never was a meeting of the minds between plaintiff and Unger regarding the material terms of a contract to compromise plaintiff's tax liability. Mr. Unger did not agree to release the lien upon a payment of $30,000 within 90 days, and plaintiff never agreed to Unger's counterproposal to release the lien upon a payment of $30,000 after plaintiff converted to a Chapter 7 bankruptcy and received a discharge. Indeed, no one at the IRS had authority to release the lien before a discharge in bankruptcy. There was no contract between plaintiff and the IRS.

■ As the court noted in its prior opinion in this case, although not addressed di-

rectly by this circuit, the law regarding tax settlement agreements has been clearly articulated:

> A settlement agreement is a contract; mutual forbearance supplies the consideration. As such, we interpret its terms using general contract law principles. *Treaty Pines Invs. Partnership v. Commissioner*, 967 F.2d 206, 211 (5th Cir. 1992). If the language of the agreement is unambiguous, we will not consider any extrinsic evidence: the meaning will be determined from the terms encompassed within the proverbial four corners of the agreement. *Goldman*, 39 F.3d at 406. Where the language is not so clear, however, we will examine the language within the context of the circumstances surrounding the execution of the agreement. *Robbins Tire & Rubber Co. v. Commissioner*, 52 T.C. 420, 435–436, 1969 WL 1677 (1969).

*Estate of Kokernot v. C.I.R.*, 112 F.3d 1290, 1294 (5th Cir.1997); *see also Goldman v. Commissioner*, 39 F.3d 402, 405–06 (2d Cir. 1994) ("As the settlement agreement constituted a contract, general principles of contract law must govern its interpretation."); *Slovacek v. United States*, 36 Fed.Cl. 250, 256 (1996) (citing *Goldman v. Commissioner*, 39 F.3d at 405). This same legal framework has also been applied in the United States Tax Court:

> The settlement of tax cases is governed by general principles of contract law. A settlement agreement is in essence a contract. Each party agrees to concede some rights which he or she may assert against his or her adversary as consideration for those secured in the settlement agreement. *Saigh v. Commissioner*, 26 T.C. 171, 177, 1956 WL 631 (1956). In determining the prop[er] meaning of the terms of the agreement, we look to the language of the agreement and the circumstances surrounding its execution. *Robbins Tire & Rubber Co. v. C.I.R.*, 52 T.C. 420, 435–436, 1969 WL 1677 (1969). Generally, extrinsic evidence will not be admitted to expand, vary, or explain the terms of a written agreement unless the agreement is ambiguous. *Rink v. Commissioner*, 100 T.C. 319, 1993 WL 101372 (1993), *aff'd*, 47 F.3d 168 (6th Cir.1995); *Woods v. Commission-*

*er*, 92 T.C. 776, 780–781, 1989 WL 32907 (1989). Petitioner bears the burden of proving that his interpretation of any ambiguous contract language is correct. Rule 142(a); *Rink v. Commissioner, supra* at 326.

*Washoe Ranches # 1, Ltd. v. Commissioner*, 72 T.C.M. (CCH) 1176, T.C. Memo.1996–495 (1996). This court is persuaded of the rectitude of this approach and will analyze the above-captioned case using the principles of contract law.

■ A valid express contract requires that the following criteria have been met: "a mutual intent to contract including offer, acceptance, and consideration; and authority on the part of the government representative who entered or ratified the agreement to bind the United States in contract." *Total Med. Management, Inc. v. United States*, 104 F.3d 1314, 1319 (Fed.Cir.1997), *cert. denied*, 522 U.S. 857, 118 S.Ct. 156, 139 L.Ed.2d 101 (1997) (citing *Thermalon Indus., Ltd. v. United States*, 34 Fed.Cl. 411, 414 (1995) (citing *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir.1990), *cert. denied*, 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991); *Fincke v. United States*, 230 Ct.Cl. 233, 244, 675 F.2d 289, 295 (1982))). Even without an express contract, there may still be an implied-in-fact contract if there is a meeting of the minds which can be inferred from parties' conduct showing, in light of the surrounding circumstances, a tacit understanding between them. *City of Cincinnati v. United States*, 153 F.3d 1375, 1377 (Fed. Cir.1998) (citing *Baltimore & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923)). "Like an express contract, an implied-in-fact contract requires '(1) mutuality of intent to contract; (2) consideration; and, (3) lack of ambiguity in offer and acceptance.'" *Id.* (quoting *City of El Centro v. United States*, 922 F.2d at 820). An express offer and acceptance are not necessary, but the parties' conduct must indicate mutual assent. *Id.* In addition, if the United States is a party, the government representative whose conduct is relied upon must have actual authority to bind the government in contract. *Id.* The government, however, is not bound by the

acts of its agents beyond the scope of their actual authority. *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1432 (Fed.Cir.1998), *cert. denied*, 525 U.S. 1177, 119 S.Ct. 1111, 143 L.Ed.2d 107 (1999). "Anyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government, and this risk remains with the contractor even when the Government agents themselves may have been unaware of the limitation on their authority." *Trauma Servs. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997).[8]

■ The defendant argues that the exchanged correspondences between plaintiff and the IRS cannot constitute a binding agreement because there was no meeting of the minds with respect to the date when payment could be made in return for release of the federal tax lien. The March 8, 1995 offer letter from plaintiff's counsel stated, in relevant part:

This correspondence is to confirm that the Internal Revenue Service has determined and agreed that Mr. Buesing is entitled to a discharge regarding, and is relieved of personal liability for, personal income tax liabilities for the tax years 1987, 1988 and 1989, subject to obtaining an Order Granting Discharge from the Bankruptcy Court. For ease of reference and your acknowledgment and understanding, I have enclosed your letter dated January 23, 1995 stating and acknowledging that the IRS will not contest the dischargeability of Mr. Buesing's Form 1040

tax liabilities for the years 1987, 1988 and 1989.

This shall also constitute an offer in compromise of all Federal Tax Levies and Liens on Mr. Buesing's real and personal property, including (but limited to) his equity in his personal residence and the value of his stock in Buesing Corporation. As you know, these Federal Tax Levies and Liens encumber Mr. Buesing's real and personal property to the extent of the above-referenced 1987, 1988 and 1989 tax liabilities.

In full satisfaction, extinguishment, and release of these Federal Tax Levies and Liens, Mr. Buesing makes the following ... offer:

&ast; &ast; &ast; &ast; &ast; &ast;

2. $30,000.00 in cash within 90 days of IRS acceptance ...

The purported acceptance from Revenue Agent Unger, dated March 28, 1998, states:

The Internal Revenue Service agrees that the value of the real and personal property to which our Notice of Federal Tax Liens attach is $30,000.00. Following Chapter 7 discharge by the court and receipt of $30,000.00, the 1987, 1988, and 1989 income tax liabilities of the debtor will be discharged and the Notice of Federal Tax Liens will be released.

This is a procedure that has several steps involving several people, so the actual release will not appear at the county recorders office for about 4 weeks after the dis-

8. In the previous opinion in this case, the court noted the parties' dispute with respect to Mr. Unger's settlement authority:

The facts available to the court, in the parties' papers filed with the court, present uncertainty as to whether Revenue Agent Unger had the authority to bind the government in a contract to release the tax lien that was upon the plaintiff's property. The parties agree that Revenue Agent Unger was delegated in the place of his supervisor Edward Perry as Acting Chief of the Chapter 7/11 Insolvency Section of the Special Procedures Function Collection Branch of the IRS Collection Division in Phoenix, Arizona, on the day that Unger wrote the March 28, 1995 letter. In addition, there appears to be some controversy as to whether Revenue Agent Unger had obtained approval on the proposed settlement agreement from his

superior, Mr. Perry. These facts are of material significance to the outcome of this litigation. Therefore, it is prudent for the court to deny the motion to dismiss, pending an appropriate determination of Revenue Agent Unger's authority.

Having heard the testimony of Mr. Unger and Mr. Perry, the court is satisfied that they considered the contemplated settlement terms at issue in this case, and that they needed no further approval from others within the IRS to bind the IRS to a settlement agreement in this case. As noted *infra*, however, the parties never entered into a settlement agreement, due in part to statutory limitations on the power of the IRS to release tax liens which precluded the IRS representatives from agreeing to some of plaintiff's proposed settlement terms.

charge and money are received. Payment should be made directly to this office to minimize delay.

Defendant argues that the "within 90 days of IRS acceptance" language in plaintiff's offer letter was a material term to which no one at the IRS ever agreed. After listening to the testimony at trial and evaluating the parties' arguments on this issue, the court agrees that plaintiff's ninety-day limit was a material term and that the combination of the March 8 and March 28 letters cannot be seen as an offer and acceptance because that material term intentionally was removed from the purported March 28 "acceptance." Edwin Perry, Revenue Officer Unger's supervisor, noted at trial that the "within ninety days" term of plaintiff's offer was unacceptable to the IRS "because [the release of the lien is] dependent on the discharge not on 90 days. There was no time frame. Neither party had any control over the time frame . . . for the issuing of the discharge by the [bankruptcy] court." Mr. Unger later corroborated this notion and stated that he also had deemed the ninety-day time period as an "unacceptable" term because it was uncertain when plaintiff's discharge from bankruptcy would occur, and the discharge was a necessary precursor to release of the federal tax lien. Mr. Unger gave the following testimony at trial:

> Q. All right. And can you extinguish a lien in a Chapter 11 under—within a fixed time period such as 90 days?
>
> A. No. Because you still have the issue of the discharge.
>
> Q. And that is the Plaintiff's discharge from bankruptcy?
>
> A. The discharge of his total tax liability. It is not just the lien equity.

> Q. And that occurs when the Bankruptcy Court discharges the debtor from bankruptcy?
>
> A. That is correct.
>
> Q. And that had not happened at this point? [when plaintiff had offered to pay $30,000.00 within ninety days of IRS acceptance].
>
> A. That had not happened in [plaintiff's case.]
>
> Q. And did you know on March 8, 1995, when Plaintiff's discharge from bankruptcy was going to take place?
>
> A. I had no knowledge whatsoever.

The position taken by Mr. Perry and Mr. Unger has statutory support under 26 U.S.C. § 6325(a) (1994), which makes no distinction between Chapters 7 and 11. The statute states in relevant part:

> (a) **Release of lien.**—Subject to such regulations as the Secretary may prescribe, the Secretary shall issue a certificate of release of any lien imposed with respect to any internal revenue tax not later than 30 days after the day on which—
>
>> (1) **Liability satisfied or unenforceable.**—The Secretary finds that the liability for the amount assessed, together with all interest in respect thereof, has been fully satisfied or has become legally unenforceable; . . .

As Mr. Perry noted at trial, the bankruptcy discharge makes the lien legally unenforceable. He stated, while discussing a Chapter 7 discharge, "Prior to the discharge, [the lien] is not unenforceable, we have a stay but it is not unenforceable. And nobody really has the authority to release that lien until the court issues the discharge. That's the legal requirement to make it unenforceable." The IRS had no control over the timing of plaintiff's discharge from bankruptcy, so it could not agree to the ninety-day time period which plaintiff proposed.[9] Instead, Mr. Un-

9. Furthermore, plaintiff's attorney and Mr. Unger engaged in several interim conversations between March 8, 1995 and March 28, 1995. During those conversations, the parties agreed that plaintiff would need to obtain a discharge under a Chapter 7 bankruptcy proceeding, rather than a Chapter 11 proceeding. As of March 28, 1995, plaintiff had not yet converted from Chapter 11 to Chapter 7. When plaintiff did convert, his conversion would have begun a new sixty-day period in which creditors could have objected to a discharge, and the period would not have started until the first meeting of creditors after conversion. *See* Fed. R. Bankr.P. 1019(2); Fed R. Bankr.P. 4004(a). If the meeting of creditors took place more than thirty days from the date of conversion, the additional sixty-day period for discharge objections would have placed any possible discharge outside of ninety days from the time of the March 28, 1995 IRS letter. This

ger altered the terms of plaintiff's offer and responded with what is seen most reasonably as a counteroffer. Thus, defendant's March 28, 1995 letter was not an acceptance.

The above analysis finds support in the treatise *Corbin on Contracts*, which states that "[a] communicated offer creates a power to accept the offer that is made and only that offer. Any expression of assent that changes the terms of the offer in any material respect may be operative as a counter-offer; but it is not an acceptance and consummates no contract." 1 *Corbin on Contracts* § 3.28 (1993) (footnote omitted). The terms of the March 28, 1995 IRS letter differed materially from plaintiff's offer by placing no limitation on the time period for release of the lien on the Clubhouse Drive property. Moreover, Mr. Unger's letter explicitly added another condition to the agreement, namely, that Mr. Buesing first had to obtain a discharge of a Chapter 7 bankruptcy proceeding before the lien would be released.[10] Mr. Unger's letter stated that the tax lien would be released "[f]ollowing Chapter 7 discharge by the [bankruptcy] court and receipt of $30,000.00." For these reasons, Mr. Unger's March 28, 1995 letter is seen most appropriately as a counteroffer to Mr. Buesing.[11]

It is well established that a counteroffer may be accepted by conduct. *See Union Realty Co., Ltd. v. Moses,* 984 F.2d 715, 722 n. 6 (6th Cir.1993); *see also Ismert & Assocs. v. New England Mut. Life Ins. Co.,* 801 F.2d 536, 541 (1st Cir.1986) ("an offer may be accepted by overt acts."); *Kurio v. United States,* 429 F.Supp. 42, 64 (S.D.Tex. 1970) ("a contract will arise if conduct by the original offeror following receipt of the late acceptance amounts to an acceptance of the

counteroffer"). "Such acceptance does no violence to the 'mirror image' rule ...." *Union Realty Co., Ltd. v. Moses,* 984 F.2d at 722 n. 6 (citing hornbook "mirror image" rule articulated in *Canton Cotton Mills v. Bowman Overall Co.,* 149 Tenn. 18, 257 S.W. 398 (1924)).

Plaintiff argues that, if Mr. Unger's March 28, 1995 letter is seen as a counteroffer, a contract still was formed as a result of plaintiff's subsequent actions. Mr. Unger's counteroffer required three things: (1) that plaintiff convert his bankruptcy to a Chapter 7 proceeding, (2) that he pay the IRS $30,-000.00, and (3) that he obtain a discharge of his bankruptcy. With respect to the first requirement, plaintiff's bankruptcy was converted from Chapter 11 to Chapter 7, and the conversion was made official by an Order of the bankruptcy court on April 26, 1995.[12] For the payment to the IRS, plaintiff attempted to accomplish this by presenting a certified check for $30,000.00 on June 16, 1995. The IRS, however, refused acceptance. According to plaintiff, "[B]y tendering the $30,000.00 before the IRS withdrew its self-styled counter-offer or proposal, Mr. Buesing substantially performed, and thereby accepted, the offer/proposal."

By presenting payment after the bankruptcy conversion, plaintiff argues that he performed the portion of Mr. Unger's requirements which were within plaintiff's power to effectuate. However, a close examination of plaintiff's conduct indicates that he was not accepting the counter-offer. Instead, plaintiff still was attempting to implement the terms of his original March 8, 1995

likely scenario is further evidence that the IRS would not have agreed to a ninety-day limitation.

10. Plaintiff's attorney's March 8, 1995 offer letter had noted the parties' agreement that release of Mr. Buesing's tax liabilities was "subject to obtaining an Order Granting Discharge from the Bankruptcy Court," however, plaintiff's attorney had not indicated when that discharge from bankruptcy had to occur.

11. The court notes that its prior opinion in this case indicated that a contract perhaps had been formed. That position, however, was a preliminary finding based upon an incomplete record.

After conducting a trial, compiling a fully-developed body of evidence, and re-reading pertinent documents within the context of the parties' testimony, the court has re-evaluated its position and cannot conclude that a contract was ever formed between plaintiff and the IRS.

12. It is unclear whether plaintiff affirmatively decided to convert from a Chapter 11 bankruptcy proceeding to a Chapter 7. The bankruptcy court converted plaintiff's proceeding because plaintiff failed to file a Chapter 11 disclosure statement and plan of reorganization by a January 31, 1995 deadline.

offer which had not been accepted by the IRS.

When plaintiff and his attorney attempted to present the $30,000.00 certified check to the IRS on June 16, 1995, they requested that an IRS official sign a document which accompanied the check. The document, titled "Satisfaction and Receipt of Payment under Agreement," read as follows:

The Internal Revenue Service, by its authorized undersigned agent, acknowledges and accepts payment from Gerald Buesing (Taxpayer I.D. # 469–50–8084) in the amount of $30,000.00 paid this date in certified funds. Mr. Buesing's payment of $30,000.00 satisfies the payment required of him in the attached agreement between Mr. Buesing and the Internal Revenue Service, which payment must be made on or before the expiration of 90 days following March 28, 1995.

This "payment satisfaction document" was provided to the court at trial as an exhibit. Unfortunately, the exhibit did not include the referenced "attached agreement," so it is at first unclear under what agreement plaintiff purported to be operating. However, the document's denotation of "before the expiration of 90 days following March 28, 1995" recites a limitation—ninety days—which was only contained in plaintiff's original March 8, 1995 offer. Because plaintiff's March 8, 1995 letter had anticipated payment within ninety days of IRS acceptance, and because plaintiff's payment satisfaction document alleged that the ninety-day period had begun on March 28, 1995, it is apparent that plaintiff believed his March 8, 1995 offer had been accepted by the IRS through Mr. Unger's March 28, 1995 letter. Thus, the "attached agreement" only could have been the plaintiff's March 8, 1995 offer or a summation of that offer's terms and conditions, and the court has noted above that the March 8, 1995 offer never was accepted by the IRS.

As plaintiff was attempting to perform the requirements of his March 8, 1995 letter, the court must agree with defendant that Mr. Buesing's actions could not have been an acceptance of Mr. Unger's March 28 counteroffer. The Restatement (Second) of Contracts § 50(1)(1981) notes that "[a]cceptance of an offer is a manifestation of assent to the terms thereof . . . ." With his belief that the ninety-day limitation was still valid, plaintiff was not assenting to the terms of defendant's counteroffer.

Furthermore, plaintiff's conduct in attempting payment provides additional evidence that there was no meeting of the minds. Defendant's counteroffer allowed for the release of the lien only "*[f]ollowing* Chapter 7 discharge by the court and receipt of $30,000.00." (Emphasis added.) When Mr. Buesing presented the certified check, he asked for an immediate release of the tax lien in exchange. This would have been appropriate under the terms of plaintiff's March 8, 1995 offer, but was unacceptable to the IRS because no discharge from bankruptcy had been granted yet. For the above reasons, the court holds that a contract never was formed between plaintiff and the IRS to achieve the release of the federal tax lien on the Clubhouse Drive property.

## II. Material misrepresentation and unilateral mistake

Even were the court to hold that a contract existed between plaintiff and the IRS, defendant argues that it would be voidable due to a material misrepresentation on the part of plaintiff, or due to a unilateral mistake on the part of the IRS. In either instance, defendant's arguments center on the circumstances surrounding the sale of the Clubhouse Drive property.

With respect to the material misrepresentation contention, defendant states:

Plaintiff's misrepresentations regarding his wife's interest in the property, his intention to sell, the value of the property, and the actual listing and contract for sale at a higher price all induced Unger to believe that the property would not be sold and that the IRS would not receive more than $30,000 upon a forced sale. Had plaintiff not concealed the facts of the pending sale, Unger would have simply waited for the sale to occur and to receive the proceeds according to the IRS's interest. Those proceeds were still insufficient to satisfy plaintiff's tax liability, and plaintiff certainly would have received nothing. Plaintiff

had insufficient equity in his house to receive any funds from its sale after payment of the mortgage, the IRS, and his wife; he should not now receive such funds, and be enriched, as a result of his misrepresentations.

Defendant argues that plaintiff's intention to keep his home induced Mr. Unger to agree to an estimated value of the house rather than the most accurate value determined by the actual sale of the property. Plaintiff, in turn, counters that defendant should have known that keeping the house was not a certainty for plaintiff. Plaintiff's post-trial brief states:

> Mr. Buesing has continually maintained that he certainly wanted to keep the house but that he stated that he might have to sell the house; that despite his fondness for the house, his financial situation, his failing business and his ongoing divorce— all of which the IRS was well aware— might prevent him from keeping the house.

■ As the court noted in its prior opinion in this case, the United States Court of Appeals for the Federal Circuit has quoted approvingly the Restatement (Second) of Contracts § 162 (1979) defining material misrepresentation. *See T. Brown Constructors, Inc. v. Pena,* 132 F.3d 724, 729 (Fed.Cir. 1997) ("A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so."). The Restatement (Second) of Contracts § 164(1) provides that a contract is voidable when (1) a party made a misrepresentation, (2) the misrepresentation was material, (3) the misrepresentation induced the other party to enter into the contract, and (4) the other party was justified in relying on the misrepresentation. *See Morris v. United States,* 33 Fed.Cl. 733, 745 (1995) (adopting the Restatement (Second) of Contracts test for misrepresentation); *National Rural Util. Coop. Fin. Corp. v. United States,* 14 Cl.Ct. 130, 142 (1988) (adopting the Restatement (Second) of Contracts test for misrepresentation), *aff'd,* 867 F.2d 1393 (Fed.Cir.1989); *Lehner v. United States,* 1 Cl.Ct. 408, 415 (1983) (adopting the Restatement (Second) of Contracts test for misrepresentation). The

United States Court of Appeals for the Federal Circuit has applied the same concept of material misrepresentation against both the government and a plaintiff in this court. *See, e.g., Roseburg Lumber Co. v. Madigan,* 978 F.2d 660, 667 (Fed.Cir.1992); *Summit Timber Co. v. United States,* 230 Ct.Cl. 434, 441, 677 F.2d 852, 857 (1982); *Morrison–Knudsen Co. v. United States,* 170 Ct.Cl. 712, 719, 345 F.2d 535, 539 (1965); *Morris v. United States,* 33 Fed.Cl. 733, 744–47 (1995).

■ The evidence presented at trial indicates that, even had the court concluded that there was a contract, the contract would have been voidable due to plaintiff's misrepresentation about whether the Clubhouse Drive property would be sold. It is apparent that plaintiff made a misrepresentation by failing to inform Mr. Unger that the sale of the house would potentially go forward shortly. When plaintiff and Mr. Unger initially met to discuss plaintiff's bankruptcy and the tax lien on his house, plaintiff did disclose his financial and divorce problems, and he and Mr. Unger did discuss the possibility that plaintiff might have to sell his house. Mr. Unger confirmed this with his trial testimony. However, while the possibility of sale was raised, plaintiff's statements to Mr. Unger, as described by plaintiff at trial, would have left a reasonable person with the impression that plaintiff was going to keep the Clubhouse Drive property. Mr. Buesing testified as follows:

Q. Did you have a discussion or did you make, did you tell Mr. Unger what your intentions were with respect to the Clubhouse Drive home?

A. I was always quite clear in reference to settlement and payment and/or terms that I really only had two avenues because my business was not doing well enough for me to envision that paying off any kind of debt, is that even though I'd like to maintain the residence on Clubhouse Drive that it was either sell that or borrow the money, that those were the two options that I saw.

Q. Did you tell Mr. Unger that you wanted to keep the house?

A. Yes.

Q. Did you want to keep the house?

A. Definitely.

Thus, while plaintiff indicated that sale of the house was a possibility, he indicated to Mr. Unger that he did not want to choose that option. Furthermore, when asked whether he told Mr. Unger that he might not be able to keep the house, plaintiff's answer was evasive. He stated:

> Because of everything that was going on in and around that time, Jeff [McKee, the questioning attorney], between working with the business and trying to get that back on its feet and working with the creditors, the accountants in reference to the dischargeability just prior to that, and all the other things that were going on financially, the divorce and so forth, I was just really pretty much upside-down.

In addition, plaintiff's testimony indicated that he, himself, did not see sale of the house as a realistic option. Plaintiff testified that "[w]ith the bankruptcy I was advised that the odds that I could get a mortgage if I could sell the house were nil, slim to none. And so my intentions were to keep the house. And I liked the house."

Plaintiff's communicated intention to keep the Clubhouse Drive property impacted the method by which Mr. Unger valued plaintiff's house. Instead of waiting for an actual sale of the home to occur to get an actual market value, Mr. Unger estimated the valuation of the house at $300,000.00 based on comparable properties information which plaintiff supplied. This was not Mr. Unger's preferred method of establishing a value for the house, a value which largely determined plaintiff's total equity in his real and personal property that was available to satisfy the IRS lien. Mr. Unger explained at trial:

> Q. Would you agree that there are benefits to the IRS to agree to the value of real property such as the Clubhouse Drive home because an agreement provides certainty for the IRS? You've got a number, it's a known commodity?

A. Actually, I don't agree with that. I think when I value a piece of property unknowingly, I'm at extreme risk. If I have a sale I know exactly what I'm getting and I can validate the sale. But I'm, I am never as comfortable with a valuation as I am with a sale.

Q. I heard you say "when I value a piece of property unknowingly." What does that mean?

A. It's a crap shoot. I mean you take some information. It's very hard to judge the real world out there or the marketplace. The marketplace changes. The uniqueness of his house, the very time we spent discussing how his house sold and what sold it, those are things that can only be measured by the sale.

Q. You're absolutely right. You're absolutely right. And it is a crap shoot. And doesn't that fact make it a good reason why the IRS wants to agree to a dollar figure?

A. Absolutely not. I would always take a sale over a guess.

Plaintiff's counsel further questioned Mr. Unger as to what the IRS response would have been if plaintiff's property had later sold for less than the estimated value, instead of more, as occurred here. Mr. Unger stated, "If you sell the property we get the equity. It's cut and dried. There's no guesswork, there's no decision making, it's a simple process." Importantly, Revenue Officer Unger concluded that "I would, we would never have done this, any of this if Mr. Buesing had said, I'm selling my property."[13]

Plaintiff's expressed intent to keep his home is material because it affected Mr. Unger's valuation of plaintiff's home, and, hence, the IRS estimation of plaintiff's monetary interest in the property. This, in turn, affected the conditions under which the IRS was willing to release its lien, inducing defendant to allegedly enter into an agreement which defendant otherwise would have rejected. The consequences of plaintiff's ex-

---

13. Later, when discussing his March 28, 1995 letter to plaintiff, Mr. Unger explained why he had not stated a condition in his letter that plaintiff not sell the Clubhouse Drive property: "I thought we had agreed to that two years ago, well, in our very first meeting with the commitment I want to keep the house. Because at that time I made the commitment I'm willing to go the route that allows you to keep your house."

pressed intent are evident in this case: the home eventually sold for $40,000.00 more than its estimated value, potentially leaving plaintiff with a windfall.[14] Had the IRS known that plaintiff was going to sell the property, it would have waited for the consummation of the sale in order to precisely determine plaintiff's monetary interest. This procedure would have avoided the possibility of the IRS shortchanging itself and collecting less from the plaintiff than it was legally entitled to under the lien.

Plaintiff argues that there was no misrepresentation because he originally desired to keep his house, at the time when he and the IRS allegedly reached an agreement to settle his tax lien. The evidence, however, contradicts this position. Plaintiff made his original offer, via letter, on March 8, 1995. After ensuing discussions between Mr. Unger and plaintiff's attorney, defendant responded by letter on March 28, 1995. As noted above, had the court concluded that a contract was formed, it could not have been prior to March 28, 1995, because, based on the evidence in the record, the IRS letter of that date constituted the earliest possible acceptance. Prior to this purported acceptance of his offer, the record indicates that plaintiff had reversed his decision to keep his home. First, plaintiff signed a listing agreement with Century 21 Real Estate on March 15, 1995 which gave Century 21 the right to sell the Clubhouse Drive property beginning on March 16, 1995. Second, he informed his divorce attorney on March 17, 1995 that he had reached a settlement with the IRS and needed to sell the home. Third, the Clubhouse Drive property was publicly advertised for sale in a local newspaper beginning on March 22, 1995.

Plaintiff argues that, while the house was listed for sale, it was noted as being TOM, or "Temporarily Off the Market." However, one of plaintiff's real estate agents, Barbara

Levanson, testified that any TOM restrictions are placed in the listing agreement. No such restriction appears in plaintiff's listing agreement. Moreover, the same agent recalled showing the house to potential buyers within the first week to ten days after it was listed, and stated that she could not recall any instance where a house was advertised in the newspaper if it was not available for purchase. While the testimony of plaintiff's other real estate agent, Alan Levanson, Barbara Levanson's husband, indicated that the house was TOM or perhaps otherwise held from sale, Mr. Levanson contradicted himself by noting other activity regarding sale of the house at that time, such as advertising which did not indicate TOM status.

It is apparent that plaintiff took affirmative steps to sell his house and failed to inform Mr. Unger of his change in position. Plaintiff's failure to inform the IRS of this information, coupled with his original stated desire to keep the Clubhouse Drive property, constituted a misrepresentation which caused Mr. Unger to estimate the value of plaintiff's home. Mr. Unger would not have agreed to estimate the value had he known that sale of plaintiff's home was imminent, and that he, therefore, could have obtained an actual sale value. Thus, the court concludes that, even had a contract been formed between plaintiff and the IRS, the contract would have been voidable due to a material misrepresentation on plaintiff's part.

Defendant also argues that "even if the Court were to determine that a binding agreement was formed between the IRS and plaintiff to release the lien for $30,000 while he was still in Chapter 7, the contract is voidable as a matter of law because of Unger's unilateral mistake." Largely for the same reasons that a material misrepresentation was found, in particular that plaintiff led defendant to believe he would keep the Club-

14. Plaintiff attempts to argue that $40,000.00 difference between the sale price of the Clubhouse Drive property and the estimated value of the property is due to the inclusion of furnishings with the sale of the home. Plaintiff contends that the furnishings were worth approximately $30,000.00. Mr. Buesing has failed to convince the court that this is true. No evidence was offered to substantiate this contention apart from the testimony of Mr. Buesing and one of his real estate agents. It is also noteworthy that plaintiff listed the value of these furnishings at the exempt limit of $2,500.00 in his bankruptcy filings. Plaintiff cannot have it both ways: a low value to avoid his creditors in bankruptcy and a high value to make it appear that his home is worth less the sale price would indicate.

house Drive property rather than sell it, the court believes that, had an agreement been formed between plaintiff and the IRS, it would be voidable by defendant due to a unilateral mistake.

■ Unilateral mistake is defined in the Restatement (Second) of Contracts § 151 (1981), and states "[a] mistake is a belief that is not in accord with the facts." *See National Rural Utils. Coop. Fin. Corp. v. United States*, 14 Cl.Ct. at 141. In order to show that there was a unilateral mistake, a party must demonstrate a:

(1) Mistake by one party, not bearing the risk of such mistake, as to a basic assumption on which he made the contract;

(2) that has a material effect on the agreed exchange of performance; and

(a) the effect of the mistake is such that enforcement of the contract would be unconscionable; or

(b) the other party to the contract has reason to know of the mistake.

*Northrop Grumman Corp. v. United States*, 47 Fed.Cl. 20, 21 (2000) (quoting *National Rural Utils. Coop. Fin. Corp. v. United States*, 14 Cl.Ct. at 141)[15]; *Nevin v. United States*, 43 Fed.Cl. 151, 154 (1999); *aff'd*, 2000 WL 366280 (Fed.Cir.2000). As discussed with respect to material misrepresentation, Mr. Unger's belief that plaintiff would keep

his house was a mistake which led Mr. Unger to estimate the value of plaintiff's house instead of waiting for its sale. The terms of the purported agreement between the IRS and plaintiff were based on the stated desire of plaintiff to keep the Clubhouse Drive property. Plaintiff retaining his residence was, thus, a basic assumption on which the IRS made the alleged contract, and the assumption's materiality has been demonstrated above in the court's analysis of the material misrepresentation claim.

In order to find that there was a unilateral mistake, however, the court must still determine that the IRS did not bear the risk of making a mistake, and that either (a) enforcement of the contract would be unconscionable, or (b) plaintiff had reason to know of the defendant's mistake. *Northrop Grumman Corp. v. United States*, 47 Fed.Cl. at 21. The Restatement (Second) of Contracts addresses "When a Party Bears the Risk of a Mistake" in section 154:

A party bears the risk of a mistake when

(a) the risk is allocated to him by agreement of the parties, or

(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

---

**15.** The court in *National Rural Utils. Coop. Fin. Corp. v. United States*, 14 Cl.Ct. at 141, cited the Restatement (Second) of Contracts § 153, which states:

**§ 153. When Mistake of One Party Makes a Contract Voidable**

Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and

(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or

(b) the other party had reason to know of the mistake or his fault caused the mistake.

Restatement (Second) of Contracts § 153 (1981). The term "reason to know" is discussed in the Restatement (Second) of Contracts in section 19, comment b:

A person has reason to know a fact, present or future, if he has information from which a

person of ordinary intelligence would infer that the fact in question does or will exist. A person of superior intelligence has reason to know a fact if he has information from which a person of his intelligence would draw the inference. There is also reason to know if the inference would be that there is such a substantial chance of the existence of the fact that, if exercising reasonable care with reference to the matter in question, the person would predicate his action upon the assumption of its possible existence.

Reason to know is to be distinguished from knowledge and from "should know." Knowledge means conscious belief in the truth of a fact; reason to know need not be conscious. "Should know" imports a duty to others to ascertain facts; the words "reason to know" are used both where the actor has a duty to another and where he would not be acting adequately in the protection of his own interests were he not acting with reference to the facts which he has reason to know.

Restatement (Second) of Contracts § 19 cmt. b (1981) (footnotes omitted).

(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

Restatement (Second) of Contracts § 154 (1981).

 In the present case, the risk of a mistake was not allocated to the defendant under the alleged contract or any other agreement. The court has noted that defendant was unaware of plaintiff's decision, prior to the time of plaintiff's alleged tax settlement with IRS, to seek the sale of his home. Defendant had been told by plaintiff that plaintiff desired to keep his home, and plaintiff made no effort to inform Mr. Unger that the Clubhouse Drive property had been listed for sale with realty agents and advertised for sale in a local newspaper. Mr. Unger could not reasonably have been aware that he did not possess the "whole story," and it would not be reasonable to allocate that risk to him in a situation in which plaintiff had an obligation to alert Mr. Unger of the change of mind with respect to the sale of the Clubhouse Drive property.

Furthermore, plaintiff had reason to know of defendant's mistake. As noted above, plaintiff informed Mr. Unger during their initial meetings that he desired to keep the Clubhouse Drive property. Apart from Mr. Buesing himself, only plaintiff's attorney was conversing with Mr. Unger on a regular basis regarding possible settlement of plaintiff's outstanding tax debt. There is no indication in the record that plaintiff informed his attorney of his attempts, prior to the date of the alleged settlement agreement, to sell his home. Consequently, plaintiff in all likelihood was the only person who could have informed Mr. Unger that he no longer intended to keep the property. Plaintiff, therefore, knew that, at the time of the purported agreement, Mr. Unger was still operating under the assumption that plaintiff wished to keep his home.[16] With reason to know of the defendant's mistake established, all of the elements for a unilateral mistake have been satisfied, and the court finds that, even had a contract been formed between

plaintiff and the IRS, it would be voidable by the government.

### III. Equitable estoppel

 Plaintiff also contends that his situation meets the requirements to equitably estop the government from denying the existence of a contract between himself and the IRS. The doctrine of equitable estoppel is a remedy by which a party may be precluded, by a party's own act or omission, from asserting a right to which it otherwise would have been entitled. *See Heckler v. Community Health Servs. of Crawford County, Inc.,* 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). The traditional elements for asserting estoppel against the government in the context of a contract dispute are: "(1) the government must know the true facts; (2) the government must intend that its conduct be acted on or must so act that the [party] asserting the estoppel has a right to believe it so intended; (3) the [party] must be ignorant of the true facts; and (4) the [party] must rely on the government's conduct to his injury." *JANA, Inc. v. United States,* 936 F.2d 1265, 1270 (Fed.Cir.1991), *cert. denied,* 502 U.S. 1030, 112 S.Ct. 869, 116 L.Ed.2d 775 (1992) (citing *American Electronic Laboratories, Inc. v. United States,* 774 F.2d 1110, 1113 (Fed.Cir.1985); *Emeco Indus., v. United States,* 202 Ct.Cl. 1006, 485 F.2d 652, 657 (1973)). To claim estoppel, a party must have relied on an "adversary's conduct 'in such a manner as to change his position for the worse' and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *See Heckler v. Community Health Servs. of Crawford County, Inc.,* 467 U.S. at 59, 104 S.Ct. 2218 (quoting 3 J. Pomeroy, EQUITY JURISPRUDENCE § 805, at 192 (S. Symons ed.1941)).

Although the United States Supreme Court and other courts have left open the narrow possibility that under limited circumstances and in cases of affirmative misconduct by a government agent an estoppel

---

16. In the end, Mr. Unger did not become aware of a possible sale until plaintiff found a buyer and had his attorney request an immediate release of the federal tax lien on June 15, 1996 to facilitate the sale of the home.

claim against the government may succeed,[17] thus far, federal courts generally have done so only while rejecting, for a variety of reasons, each attempt at application of the estoppel theory in the particular case then before the court. *See, e.g., Heckler v. Community Health Servs. of Crawford County, Inc.,* 467 U.S. at 66, 104 S.Ct. 2218 (holding that the detriment faced was not so severe or imposed in such an unfair way as to invoke the estoppel doctrine); *Office of Personnel Management v. Richmond,* 496 U.S. 414, 434, 110 S.Ct. 2465, 110 L.Ed.2d 387 (holding that the courts cannot estop the Constitution and, therefore, there can be no "estoppel by a claimant seeking public funds"), *reh'g denied,* 497 U.S. 1046, 111 S.Ct. 5, 111 L.Ed.2d 821 (1990); *Henry v. United States,* 870 F.2d 634, 637 (Fed.Cir.1989) (holding that the oral advice given by an IRS agent did not constitute affirmative misconduct because the element of reasonable reliance was absent); *Hanson v. Office of Personnel Management,* 833 F.2d 1568, 1569 (Fed.Cir.1987) (holding that misrepresentations made by Office Personnel Management and Office of Workers Compensation Programs officials to a benefits recipient did not constitute affirmative misconduct because the officials acted in good faith on the basis of the currently accepted reading of the statute).

 Plaintiff's equitable estoppel claim fails because the factual situation at bar does not present elements which are required to press such a claim against the government. Most prominently, as discussed above, the government did not know the true facts in plaintiff's case. Defendant incorrectly believed that plaintiff would remain in his house, rather than sell it. As a result, defendant negotiated with plaintiff using an estimated valuation of the Clubhouse Drive property, rather than the preferred true sale value which defendant would have had available upon the house's sale.

Furthermore, plaintiff suffered no detriment in relying on the alleged agreement. Plaintiff's course of action, purportedly taken in reliance on the agreement with Mr. Unger, was the most favorable to him at the time. As defendant aptly notes:

> When [plaintiff] converted to Chapter 7 on April 26, 1995, he had been in default in his Chapter 11 proceeding for several months for failure to file a disclosure statement and plan of reorganization by January 31, 1995. His only other option would have been dismissal from bankruptcy, which would have removed him from the protection of the bankruptcy laws and left him in the hands of each of his creditors to pursue their state law remedies against him. *See* 11 U.S.C. § 349. Had he remained in Chapter 11, he would have [had] to have filed a reorganization plan, obtained the approval of his creditors, and paid off the debt, including the tax debt, to the extent of the allowed amount of the claims, over the course of several years out of his future income. The tax lien would not be released until final payment was made. *See* 11 U.S.C. § 1129. By contrast, under Chapter 7, plaintiff's bankruptcy estate assets were liquidated, and his debts were discharged. *See* 11 U.S.C. §§ 726, 727.

Plaintiff also has not shown any detriment to his interests as a result of settling his divorce proceedings. The terms of the settlement were nearly identical to the terms of the original Antenuptial Agreement between Mr. Buesing and Ms. Michael. Plaintiff paid Ms. Michael an additional $5,000.00 above the original agreed upon sum, but any detriment from that extra payment was offset and outweighed by the fact that, in the settlement, Ms. Michael waived her right to claim a one-half interest in the Clubhouse Drive property. Moreover, plaintiff has not shown that the supposed agreement with the IRS influenced the terms of this divorce settlement.

Finally, to establish estoppel against the government, a party must show some affirmative misconduct on the part of a government official. Such misconduct is not present here. There is no indication in the record that Mr. Unger, Mr. Perry and the

---

17. Under the *Heckler* test and subsequent definitions of the elements of estoppel, without affirmative misconduct on the part of the government, there can be no equitable estoppel against the government. *See Westinghouse Elec. Corp. v. United States,* 41 Fed.Cl. 229, 240–41 (1998); *see also Hanson v. Office of Personnel Management,* 833 F.2d 1568, 1569 (Fed.Cir.1987).

IRS ever attempted to cheat or deceive plaintiff. On the contrary, the record indicates that Mr. Unger and Mr. Perry were at all times honest and forthright with Mr. Buesing, and attempted to help him resolve a debt to the IRS in a manner which would have allowed him to retain his house. They did not go back on any "deal" with plaintiff because that "deal" simply did not exist.

## CONCLUSION

After thoroughly reviewing the record and carefully examining the arguments put forth by both parties, the court has determined that no contract was formed in this case between the plaintiff and the IRS to gain the release of the federal tax lien on plaintiff's Clubhouse Drive property, and that the government is not equitably estopped from denying the existence of such a contract. Furthermore, even if a contract had been formed, the court holds that it would have been voidable by the defendant due to a material misrepresentation on plaintiff's part, and/or a unilateral mistake on defendant's part. For these reasons, plaintiff is not entitled to recover any net proceeds in excess of $30,000.00 from the sale of the Clubhouse Drive property, which were retained by the government. The Clerk's Office is directed to **DISMISS** the case.

**IT IS SO ORDERED.**